# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 6, 2004 Session

## JOHN DOE 1 EX REL. JANE DOE 1, ET AL. v. ROMAN CATHOLIC DIOCESE OF NASHVILLE, ET AL.

**Appeal by permission from the Court of Appeals, Middle Section**
**Davidson County Circuit Court**
**Nos. 00C-164 and 00C-172    Walter C. Kurtz, Judge**

---

**No. M2001-01780-SC-R11-CV - Filed January 18, 2005**

---

In two separate civil actions, the plaintiffs, John Doe 1, Jane Doe 1 and John Doe 2 brought claims of reckless infliction of emotional distress against the defendant, the Roman Catholic Diocese of Nashville. The lawsuits were consolidated for certain pretrial purposes and also for purposes of appellate review. The trial court denied in part the plaintiffs' motion to compel the defendant to provide answers to discovery and ultimately granted the defendant summary judgment as to all plaintiffs. On appeal, the Court of Appeals, holding that reckless infliction of emotional distress must be based on conduct that was directed at the plaintiff, affirmed summary judgment for the defendant. The Court of Appeals also declined to consider the plaintiffs' appeal of the partial denial of their motion to compel, regarding the issue as moot. We granted the plaintiffs' application for permission to appeal. After carefully considering the relevant authority, we hold that to be actionable, reckless infliction of emotional distress need not be based upon conduct that was directed at a specific person or that occurred in the presence of the plaintiff. Applying this holding, we conclude that the defendant is not entitled to summary judgment. Furthermore, in light of our holding, we vacate the trial court's denial of the plaintiffs' motion to compel. We remand this case to the trial court for further proceedings consistent with this opinion, including reconsideration of the plaintiffs' discovery requests.

### Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed;
### Case Remanded to the Trial Court

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, WILLIAM M. BARKER, J.J., and ALLEN WALLACE, SP. J., joined.

John A. Day, Brentwood, Tennessee, and John J. Hollins, Jr., Nashville, Tennessee, for the appellants, John Doe 1 by next friend Jane Doe 1, Jane Doe 1, and John Doe 2.

Thomas F. Mink, II, Nashville, Tennessee, Keith W. Blair, Nashville, Tennessee, and L. Gino Marchetti, Jr., Nashville, Tennessee, for the appellee, Roman Catholic Diocese of Nashville.


## OPINION


## I. Factual and Procedural Background

Because this appeal concerns a grant of summary judgment, the following statement of facts is based upon a view of the record that is most favorable to the nonmoving parties, John Doe 1 by his next friend Jane Doe 1 ("John Doe 1"), Jane Doe 1 individually and John Doe 2 (collectively the "plaintiffs"). Robinson v. Omer, 952 S.W.2d 423, 424-25 (Tenn. 1997); Byrd v. Hall, 847 S.W.2d 208, 215 (Tenn. 1993). Edward McKeown ("McKeown") became a Roman Catholic priest in 1970 and soon thereafter began working for the defendant, the Roman Catholic Diocese of Nashville (the "Diocese"). Over the next nineteen years, he worked in various parishes across Tennessee, serving frequently in positions that brought him regularly into contact with youth.

In 1973, a minor boy attending a Diocesan school informed a priest with the Diocese, Father Frank Richards ("Father Richards"), that during a camping trip McKeown had plied the boy with alcohol and then forcibly molested him. Father Richards discounted the allegation and took no follow-up action. In July 1986, a parent of the same boy informed Bishop James Niedergeses ("Bishop Niedergeses")[1] of the Diocese that McKeown had sexually assaulted her son in 1972 or 1973; Bishop Niedergeses stated that the parent came forward in the interest of preventing such abuse from recurring. When Bishop Niedergeses confronted McKeown with the allegation, McKeown readily admitted to the abuse. Consequently, Bishop Niedergeses consulted with Father Charley Giacosa ("Father Giacosa"), who as Episcopal Vicar of the Diocese assisted the Bishop with personnel matters. The parties dispute whether Father Giacosa gave notice of the abuse to Alice Reid of the Tennessee Department of Human Services and whether Ms. Reid recommended an investigation and the filing of a report.[2] Bishop Niedergeses testified that at the time he suspected that he "needed to find out whether this person [McKeown] would be a threat to anybody else." Although Bishop Niedergeses did not personally conduct such an investigation, he asked Father Giacosa to "explore any possibilities." However, Father Giacosa testified not only that "[his] role was not an investigative role," but also that he was unaware of any investigation whatsoever into the scope of McKeown's sexual misconduct.

---

[1]Bishop Niedergeses served as Bishop of the Diocese from 1975 to 1992. He was succeeded by Bishop Edward Kmiec ("Bishop Kmiec").

[2]Father Giacosa testified that he informed Ms. Reid of the incident, but that she advised him that no report was necessary because at the time (1986) the victim was an adult. However, Ms. Reid testified not only that she did not recall Father Giacosa contacting her in the matter of McKeown, but also that she would have remembered it had he done so. Ms. Reid further testified that had she been contacted, she would have recommended an investigation and the filing of a report with the Department of Human Services.

In response to the revelation of McKeown's sexual misconduct, in September 1986 Father Giacosa arranged for the St. Luke Institute in Maryland to conduct a ten-day psychological and medical evaluation of McKeown. McKeown was diagnosed with pedophilia and ephebophilia, a sexual disorder similar to pedophilia but characterized by attraction to adolescent males aged fourteen to twenty. Records of the evaluation indicate that McKeown admitted that he had "had sexual contact with approximately thirty boys over the past 14 years" and estimated that he had "had sexual contact with minors on the average 'once or twice a month' for the past 14 years." The typical age of his victims was stated to be twelve to thirteen years old.[3] The records indicate that McKeown made contact with his victims mostly "through the parish" and via his work with youth and that he typically provided alcohol to the boys "as a seductive device." The records further state that McKeown had engaged in molestation as recently as July 1986. Bishop Niedergeses first testified that he received, read and relied on these records in his dealings with McKeown, but later testified that he "had never seen them before" at the time of his deposition.

Nonetheless, in September 1986, Dr. Frank Valcour ("Dr. Valcour") of the St. Luke Institute sent to Bishop Niedergeses a personally-addressed report which summarized McKeown's evaluation. This report noted that McKeown "in a forthright way acknowledge[d] other sexual contact over the years" subsequent to his "first experience of sexual acting out [sic] with a minor" and that he was "interested in correcting his behavior." Dr. Valcour's report identified as troublesome McKeown's tendency to "offer alcohol to young people he was with to facilitate sexual interaction." Moreover, Dr. Valcour cautioned, "I had mentioned to Father Giacozza [sic] over the phone that given the number of sexual contacts, it might be prudent to review any assignment for Father McKeown that would give him widespread public exposure."[4] In conclusion, Dr. Valcour warned that it was "absolutely imperative that [McKeown] not be in the presence of teenagers unless another responsible adult is with him."

Father Giacosa not only denied discussing McKeown's pattern of abuse with Dr. Valcour, but also denied having any knowledge prior to McKeown's criminal prosecution for sexual abuse in 1999 that McKeown had had multiple victims. Father Giacosa testified that Bishop Niedergeses never brought to his attention information concerning McKeown's habitual sexual predation. Father Giacosa further testified that had Bishop Niedergeses done so, he would have taken additional remedial measures appropriate to such a broader scope of criminal misconduct by McKeown. However, McKeown himself testified that neither Bishop Niedergeses nor Father Giacosa questioned him as to whether he had sexually assaulted victims other than the boy whose parent came forward

---

[3]Police reports from McKeown's criminal prosecution indicate that McKeown's victims tended to range from ages fourteen to sixteen.

[4]Dr. Valcour's report counseled that placing McKeown in a position involving a high degree of public visibility throughout the Diocese could pose serious "risks" both to McKeown and to the Diocese.

in July 1986. Bishop Niedergeses admitted that he did not inquire into the number or identities of McKeown's other victims.[5]

After receiving St. Luke Institute's evaluation of McKeown, the Diocese decided to provide him with in-patient treatment for his sexual disorder. The St. Luke Institute was then at full capacity, and Dr. Valcour warned Bishop Niedergeses that waiting six to eight weeks to obtain an opening there was risky and unwise. Therefore the Diocese sent McKeown in October 1986 to the Institute of Living in Hartford, Connecticut. In informing McKeown of his assignment to in-patient treatment, Bishop Niedergeses explained that "[e]vidently, you find it difficult to control your sexual interest in adolescent boys;" Bishop Niedergeses testified that he referred to McKeown's victims in the plural because he relied on the reports furnished to him by the St. Luke Institute.[6] McKeown underwent intensive in-patient treatment at the Institute of Living from October 1986 to March 1987, and he remained in Hartford for a short time thereafter for out-patient treatment.

During this time, the Institute of Living communicated with Bishop Niedergeses and Father Giacosa concerning the progress of McKeown's treatment, his history of sexually molesting numerous minors, and his prognosis.[7] In connection with McKeown's release, Dr. Thomas Conklin ("Dr. Conklin") of the Institute of Living cautioned Bishop Niedergeses that "now and in the future" McKeown should not be given responsibilities that "would place him in frequent or ongoing contact with adolescents." Dr. Conklin also emphasized in an April 1987 letter to Father Giacosa that McKeown's condition would require permanent follow-up treatment: "There is no cure for Father McKeown's condition and so it is necessary that there be a continual program of therapy and monitoring to help him to maintain the same degree of control that he has now into the future." In addition to prescribing continued psychotherapy and weekly injections of Depo-Provera[8] "for the indefinite future," Dr. Conklin recommended to Father Giacosa that McKeown return to the Institute of Living on an annual or semiannual basis for a "'brief refresher course.'"[9]

---

[5]According to Father Giacosa, at his urging sometime in 1985 or 1986, the Diocese invited a Father Jamail to speak at a retreat to priests of the Diocese about the sexual abuse of minors. Father Jamail gave several presentations in which he explained, among other things, the negative effects of pedophilia upon children and the need for pastoral counseling of victims and their families.

[6]At another time, Bishop Niedergeses testified that he had never read the reports.

[7]In an October 1986 letter to the Institute of Living, Bishop Niedergeses stated that "I would very much like to receive a comprehensive clinical evaluation of Father McKeown's he[al]th problems. I'm sure he will give his authorization for this." In February 1987, McKeown authorized the Institute of Living to release his medical records to Bishop Niedergeses, and in April 1987, he did the same for Father Giacosa. Various notes by Institute of Living personnel also indicate the periodic sharing of information with Bishop Niedergeses and Father Giacosa.

[8]Depo-Provera is a synthetic steroid that serves when injected in males to inhibit production of testosterone, a hormone connected with the male sex drive.

[9]The Diocese never sent McKeown back to the Institute of Living.

Upon his return to Nashville sometime in the Spring of 1987, McKeown continued psychotherapy and Depo-Provera treatments. He lived on Diocesan property and resumed working for the Diocese as co-director of a Diocese-wide program of group meetings designed to foster spiritual development. McKeown also assisted in the performance of liturgical services at his particular parish. Although the Diocese putatively forbade McKeown's access to youth, the parties dispute whether the Diocese actually placed effective restrictions on his involvement with minors. The record shows that after his return from treatment McKeown heard children's confessions, participated openly in various Diocesan youth activities including overnight "lock-ins," and spent time individually with minor boys with whom he had made contact through the Diocese. McKeown invited Diocesan children to play with his toy train set which he had installed in the basement of his church and frequently took boys with him to high school football games, toy train shows, and other recreational events. The record also indicates that Bishop Niedergeses and Father Giacosa became aware of some if not all of these activities no later than February 1989.

In March 1988, Father Xavier Mankel ("Father Mankel") informed Bishop Niedergeses that a parent within the Diocese had revealed that in 1984 McKeown had molested her then fourteen-year-old son. The parent came forward "to see that such activities don't happen with other children," but Father Mankel discouraged her from "go[ing] public." Bishop Niedergeses testified that he did not recall making any investigation into this new allegation, nor did he inform Father Giacosa, who was ostensibly in charge of monitoring McKeown.

Bishop Niedergeses became increasingly concerned about McKeown's continuing inappropriate behavior. In December 1988, Bishop Niedergeses met with McKeown and Father Giacosa concerning McKeown's future with the Diocese. Father Giacosa's notes in preparation for the meeting (labeled "'Top Secrecy' 'Could hurt your church'") indicate that he and Bishop Niedergeses intended to pressure McKeown to leave the Diocese not only because they wanted to protect Diocesan youth from abuse, but also because they wanted the Diocese to avoid financial liability for his sexual misconduct and the scandalous publicity which might ensue from its disclosure. The notes show that Father Giacosa and Bishop Niedergeses worried about the Diocese being exposed in sensationalistic news television, such as Geraldo Rivera's investigative show "20/20."[10] The notes also show that they considered McKeown's sexual disorder to be incurable. During the meeting itself, McKeown implied that he had had multiple victims in the past and stated explicitly that "most of what [he] did was not here in this area" and that "other things could come out." Notes taken during the meeting indicate that Bishop Niedergeses posed to McKeown various options, including transfer to another diocese, leave of absence, suspension and transition to a layperson status (laicization), all of which McKeown refused to consider.

After Bishop Niedergeses learned that McKeown had openly presented a minor boy with a condom at a Christmas party, Bishop Niedergeses began the process of removing McKeown from the Diocese involuntarily. McKeown acrimoniously opposed Bishop Niedergeses' renewed

_____

[10]In notes from the meeting itself, Bishop Niedergeses discusses liability and exposure and is represented as expressing his fear that "[t]hey have crucified some bishops. As there is more national exposure–it[']s on peoples minds more. The public has no mercy [and] compassion."

-5-

suggestions of options for leaving. Thus, in April 1989, Bishop Niedergeses issued a "Decree"[11] which in relevant part: required McKeown to reside "outside the institutions of the Diocese"; relieved McKeown of all employment-related assignments with the Diocese; removed McKeown's priestly "faculties" in certain specific areas of ministry; removed from McKeown "all authorization to act as a priest in any capacity either directly or indirectly in my [Bishop Niedergeses'] name or that of the Catholic Church;" and provided a schedule for proposed financial assistance subsequent to removal. The parties dispute whether the Decree completely terminated McKeown's status as a Roman Catholic cleric and whether the Diocese continued to bear responsibility for McKeown in that respect.

By May 1989, having acquiesced to the terms of the Decree, McKeown ceased all employment activities on behalf of the Diocese, moved off Diocesan property and began residing at a mobile home community in the Nashville area. He obtained secular employment first with the Muscular Dystrophy Foundation and later with the Juvenile Court Clerk of Davidson County and the Nashville Metro Tax Assessor's Office. In March 1990, McKeown informed Bishop Niedergeses that he was working for the Juvenile Court Clerk, a position where McKeown came into contact with minors.

From McKeown's departure in 1989 until early 1994, the Diocese paid him a total of approximately $51,500 in monthly installments. The parties disagree over the proper characterization of these payments. The Diocese contends that the payments were customary charitable support intended to assist McKeown in making the transition to secular life. However, the plaintiffs maintain that the payments were made to buy McKeown's silence about the sexual molestation of Diocesan children. McKeown testified that during his negotiations with Bishop Niedergeses, he demanded $50,000 in exchange for leaving. In a March 1989 letter to Bishop Niedergeses, McKeown threatened: "If you fail to provide financial support to me as a result[] I will have no choice but [to] seek recourse from the civil courts. As you know this will entail a public 'airing' of this whole matter which I don't want but will take in order to assure my personal security."

After McKeown's departure, the Diocese continued to subsidize psychotherapy and Depo-Provera treatments for McKeown primarily under the care of Dr. John Griffin ("Dr. Griffin"). The Diocese provided health insurance until 1994. However, by sometime in 1991, McKeown felt financially unable to pay for continued therapy and, in spite of the fact that both Dr. Griffin and McKeown believed that treatment continued to be necessary, chose to discontinue treatment when the total of McKeown's unpaid bills surpassed $2,100.[12] In an August 1991 letter to Bishop

---

[11]The April Decree superseded two prior "Precepts" of February and March 1989 which contained similar provisions.

[12]In an August 1991 letter to Bishop Niedergeses, Dr. Griffin stated:

[McKeown] had to discontinue therapy because of ongoing uncertainties over the payment of the account. When he obtained employment with the Metro Government, confusion developed as to the responsibility of the Diocesan insurance plan versus that of the Metropolitan Government. In addition,

(continued...)

-6-

Niedergeses, Dr. Griffin not only informed Bishop Niedergeses that McKeown no longer was receiving treatment, but also requested that the Diocese pay the remaining unpaid balance, which the Diocese did.

Even after McKeown's departure in 1989, he continued to make contact with youth via Diocesan programs, to participate in various parish youth and recreational functions, to teach classes at his parish, and to attend football games at a Diocesan high school, often standing on the sidelines accompanied by an adolescent boy.[13] Neither the parents nor the new priest of the parish which McKeown attended were informed by the Diocese of McKeown's tendency to molest young males or of his involuntary removal from employment. Instead, the impression was given that McKeown had taken a voluntary leave of absence.

On a regular basis from 1990 until at least 1996, McKeown sexually molested numerous Diocesan boys with whom McKeown had made contact during that time through his parish and its programs. In 1995, Bishop Kmiec, Bishop Niedergeses' successor, became aware that a parent in Knoxville alleged that McKeown had molested her son several years earlier. Nevertheless, Bishop Kmiec neither confronted McKeown nor took other significant remedial action.

In 1991, McKeown met John Doe 2, a minor boy, at the mobile home community where they both lived. Over time, McKeown gradually befriended John Doe 2's family, representing himself as a priest without a parish due to political differences with the Diocese. McKeown participated in a variety of recreational activities with John Doe 2 and grew close to his family. Although John Doe 2 was not Roman Catholic and had no personal connection with the Diocese, at McKeown's invitation John Doe 2 occasionally participated in recreational activities with other minors from McKeown's parish, including standing with McKeown on the sidelines during football games at a Diocesan high school. In approximately 1994, John Doe 2 started spending the night from time to time at McKeown's residence, and McKeown began sexually abusing him. The abuse continued until discovered in May 1995 by John Doe 2's mother, who confronted McKeown and reported her concerns to the Nashville Metro Police Department.[14]

---

[12](...continued)
spokepersons in the Diocesan office indicated an unwillingness to pay the portion of the bill not covered by insurance. Fr. McKeown felt that his own income from employment was inadequate to pay for psychiatric treatment.

The Diocese, however, claims that the failure to obtain treatment was primarily McKeown's fault.

[13]In 1996, a teacher and coach at the Diocesan high school informed McKeown that he was no longer permitted to stand on the sidelines, although he could still attend games. In an apparently unsent letter addressed to McKeown by Bishop Kmiec, Bishop Kmiec expressed concern that McKeown's presence on the sidelines would cause the public to think that McKeown served the Diocese in some representative capacity.

[14]No police investigation was conducted at that time.

In October 1995, John Doe 1, a minor boy, and his mother, Jane Doe 1, moved to the mobile home community where McKeown resided. Within a short time, McKeown befriended John Doe 1 and his family, and McKeown soon developed a relationship of considerable intimacy with the family. Due to intra-family problems, McKeown actually was entrusted with protective custody of John Doe 1 beginning in 1997 or 1998. McKeown first molested John Doe 1 in November 1995 after providing him with alcohol; thereafter McKeown sexually abused him on a weekly basis from February 1996 until January 1999. Although John Doe 1 was not Roman Catholic and had no prior connection with the Diocese, he accompanied McKeown to numerous Diocesan high school football games, standing with him on the sidelines where John Doe 1 observed McKeown talking with priests. John Doe 1 also alleges that on a few occasions he attended church services with McKeown at his parish and that on one of these occasions McKeown personally introduced him to Bishop Kmiec. In January 1999, John Doe 1 revealed to a friend and then to his mother that McKeown had been sexually molesting him. Jane Doe 1 confronted McKeown, who promptly confessed not only to the sexual abuse of John Doe 1, but also to a litany of abuse of many other boys over many years. Thereafter, Jane Doe 1 reported the abuse to the Nashville Metro Police Department. As a result, McKeown was criminally prosecuted and is now incarcerated.

John Doe 1 along with his mother Jane Doe 1 and John Doe 2 filed separate civil suits against the Diocese.[15] The plaintiffs alleged that by outrageous acts and omissions, the Diocese recklessly inflicted severe emotional harm upon the plaintiffs. The two cases were consolidated for various pretrial purposes, including discovery. In a pretrial hearing, the trial court denied several parts of the plaintiffs' motion to compel discovery.

The Diocese moved for summary judgment as to all the plaintiffs, arguing that based on the undisputed facts, the plaintiffs had failed to prove outrageous conduct and proximate causation. The trial court granted the Diocese's motions, holding that to be actionable under the tort of outrageous conduct, a defendant's reckless or intentional conduct must have been directed at a particular plaintiff or the plaintiff must have had a close relationship to the individual at whom the conduct was directed. The trial court found that "the conduct of Mr. McKeown in committing sexual assaults on the plaintiffs [was] so attenuated and remote from the actions of the Diocese as to be non[-]actionable."

The plaintiffs appealed both the trial court's grant of summary judgment for the Diocese and the trial court's refusal to compel parts of the plaintiffs' discovery requests served upon the Diocese. The cases were consolidated for purposes of appeal. In the Court of Appeals, the plaintiffs contended that the trial court erred in concluding that reckless infliction of emotional distress must be directed at a particular person. The Court of Appeals, however, affirmed the trial court's grant of summary judgment.

Looking to cases from other states and drawing inferences from the facts of Tennessee decisions, the Court of Appeals held that to satisfy the requirements of the tort of outrageous

---

[15]The plaintiffs sued multiple defendants, but only the claims against the Diocese are relevant to this appeal.

conduct, "intent or reckless disregard of the consequences must be specific to a particular person." In other words, "an identified individual (or group [of] individuals) [must be] the object of the intent or reckless disregard." The Court of Appeals interpreted section 46 of the Restatement (Second) of Torts (1965) as implicitly requiring this directed-at element for all claims under the tort of outrageous conduct. The Court of Appeals further reasoned that to hold otherwise would "blur if not eradicate the distinction between intentional infliction of emotional distress and its negligence-based counterpart." The Court of Appeals declined to address the plaintiffs' appeal of the trial court's denial of their motion to compel discovery, finding this issue to be moot. This Court granted the plaintiffs' application for permission to appeal.

## II.  Analysis

### A.  Reckless Infliction of Emotional Distress

The primary issue before this Court is whether in order to be actionable reckless infliction of emotional distress must be based upon conduct that was directed at a specific person. Although this question was similarly raised before us in Lourcey v. Estate of Scarlett, 146 S.W.3d 48 (Tenn. 2004), we chose not to address it because we determined that the tortious conduct in that case had been intentionally directed at the plaintiff. We now decide this issue of first impression. Because this issue concerns conclusions of law, our standard of review is de novo with no presumption of correctness. S. Constructors, Inc. v. Loudon County Bd. of Educ., 58 S.W.3d 706, 710 (Tenn. 2001).

The tort of intentional infliction of emotional distress, also known as the tort of outrageous conduct, was recognized in Tennessee in Medlin v. Allied Inv. Co., 398 S.W.2d 270, 274-75 (Tenn. 1966). Claims based on this tort seek recovery "for mental or emotional disturbance alone, unconnected with any independently actionable tort or with any contemporaneous or consequential objectively ascertainable injury." Id. at 272. Based on Medlin and its progeny, a plaintiff suing for outrageous conduct must satisfy three elements: first, "the conduct complained of must be intentional or reckless"; second, "the conduct must be so outrageous that it is not tolerated by civilized society"; and third, "the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997); see Lourcey, 146 S.W.3d at 51; Miller v. Willbanks, 8 S.W.3d 607, 612 (Tenn. 1999). A causation requirement is implicit in the third element which necessitates that the misconduct "result in serious mental injury."

These elements correspond with section 46(1) of the Restatement (Second) of Torts (1965) ("Second Restatement"). See Miller, 8 S.W.3d at 612 (stating that this Court has "ground[ed] the cause of action for intentional infliction of emotional distress within the Restatement framework"); Medlin, 398 S.W.2d at 274 (basing its holding on the Second Restatement). Tennessee thus stands in accord with the overwhelming majority of jurisdictions that have adopted fully or in part section 46 of the Second Restatement or that impose generally the same requirements even though they have

not expressly adopted the Second Restatement.[16]  Consequently, in resolving the issue presented by this appeal, we begin, as did the Court of Appeals, with section 46.

It is important initially to clarify that section 46 divides the cause of action for outrageous conduct into direct, first-party claims and indirect, bystander claims.  Section 46 provides as follows:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or (b) to any other person who is present at the time, if such distress results in bodily harm.

A direct action under subsection 46(1) allows a plaintiff to mount a prima facie claim by satisfying with respect to himself or herself the standard elements of: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional harm.

---

[16]See Am. Rd. Serv. Co. v. Inmon, 394 So. 2d 361, 362-65 (Ala. 1980); Tommy's Elbow Room, Inc. v. Kavorkian, 727 P.2d 1038, 1043 (Alaska 1986); Lucchesi v. Frederic N. Stimmell, M.D., Ltd., 716 P.2d 1013, 1015-16 (Ariz. 1986); Brown v. Tucker, 954 S.W.2d 262, 266 (Ark. 1997); Christensen v. Superior Court, 820 P.2d 181, 202 (Cal. 1991); Rugg v. McCarty, 476 P.2d 753, 756 (Colo. 1970); Petyan v. Ellis, 510 A.2d 1337, 1342 (Conn. 1986); Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984); Food Fair, Inc. v. Anderson, 382 So. 2d 150, 153 (Fla. Dist. Ct. App. 1980); Trimble v. Circuit City Stores, Inc., 469 S.E.2d 776, 778 (Ga. Ct. App. 1996); Hac v. Univ. of Haw., 73 P.3d 46, 60-61 (Haw. 2003); Evans v. Twin Falls County, 796 P.2d 87, 97 (Idaho 1990); Farnor v. Irmco Corp., 392 N.E.2d 591, 595 (Ill. App. Ct. 1979); Doe v. Methodist Hosp., 690 N.E.2d 681, 691 (Ind. 1997); Amsden v. Grinnell Mut. Reinsurance Co., 203 N.W.2d 252, 255 (Iowa 1972); Wiehe v. Kukal, 592 P.2d 860, 862-63 (Kan. 1979); Craft v. Rice, 671 S.W.2d 247, 251 (Ky. 1984); White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991); Vicnire v. Ford Motor Credit Co., 401 A.2d 148, 154 (Me. 1979); Harris v. Jones, 380 A.2d 611, 614 (Md. 1977); Agis v. Howard Johnson Co., 355 N.E.2d 315, 318-19 (Mass. 1976); Warren v. June's Mobile Home Vill. & Sales, Inc., 239 N.W.2d 380, 390 (Mich. Ct. App. 1976); Dornfeld v. Oberg, 503 N.W.2d 115, 117-20 (Minn. 1993); Gall v. Great W. Sugar Co., 363 N.W.2d 373, 376 (Neb. 1985); Star v. Rabello, 625 P.2d 90, 91-92 (Nev. 1981); Morancy v. Morancy, 593 A.2d 1158, 1159 (N.H. 1991); Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857, 863 (N.J. 1988); Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 P.3d 333, 342 (N.M. 2001); Howell v. N.Y. Post Co., 612 N.E.2d 699, 702 (N.Y. 1993); Dickens v. Puryear, 276 S.E.2d 325, 332 (N.C. 1981); Sec. Nat'l Bank, Edgeley v. Wald, 536 N.W.2d 924, 927 (N.D. 1995); Yeager v. Local Union 20, Teamsters, 453 N.E.2d 666, 671 (Ohio 1983); Kraszewski v. Baptist Med. Ctr. of Okla., 916 P.2d 241, 248-49 (Okla. 1996); Delaney v. Clifton, 41 P.3d 1099, 1106 (Or. Ct. App. 2002); Hoy v. Angelone, 720 A.2d 745, 753-54 (Pa. 1998); Vallinoto v. DiSandro, 688 A.2d 830, 839 (R.I. 1997); Upchurch v. N.Y. Times Co., 431 S.E.2d 558, 561 (S.C. 1993); Petersen v. Sioux Valley Hosp. Ass'n, 491 N.W.2d 467, 468-69 (S.D. 1992); Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62, 66-68 (Tex. 1998); Retherford v. AT&T Communications of the Mountain States, Inc., 844 P.2d 949, 970-71 (Utah 1992); Crump v. P & C Food Mkts., Inc., 576 A.2d 441, 448 (Vt. 1990); Russo v. White, 400 S.E.2d 160, 162 (Va. 1991); Reid v. Pierce County, 961 P.2d 333, 337 (Wash. 1998); Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 425 (W.Va. 1998); Anderson v. Cont'l Ins. Co., 271 N.W.2d 368, 378 (Wisc. 1978); Worley v. Wyo. Bottling Co., 1 P.3d 615, 628 (Wyo. 2000).

However, a bystander claim under subsection 46(2) imposes somewhat different requirements. First, the tortfeasor's outrageous conduct must have been intentionally or recklessly "directed at a third person" in a way that satisfies as to the third party the outrageous conduct requirement of subsection 46(1). Second, the bystander plaintiff must have suffered severe emotional distress. Third, the plaintiff either must bear a close family relation to the third party or such severe emotional distress must be suffered that it results in physical harm. In both instances, the bystander plaintiff must have perceived contemporaneously and from close spatial proximity the emotional harm inflicted upon the third party. Dan B. Dobbs, The Law of Torts § 307, at 833-34 (2001).

The Court of Appeals in this case inferred from the overall structure of section 46 that to be actionable direct claims must be based upon conduct that had been "directed at" the plaintiff. The Court of Appeals recognized that explicit directed-at language is contained solely in subsection 46(2). Nonetheless, the Court of Appeals stated, "While [subsection] 46(1) does not expressly include the words, 'directed at,' it is clear from the structure of the entire section on 'Outrageous Conduct Causing Severe Emotional Distress' that the requirement is understood."

In order to show that the directed-at requirement has been implicitly recognized in Tennessee, the Court of Appeals supplied a catalog of outrageous conduct decisions in which the tortfeasor's conduct as a matter of fact had been directed toward a particular person. See, e.g., Miller, 8 S.W.3d at 613-14 (doctor spreading false rumors that parent's illegal drug use affected newborn infant); Lawrence v. Stanford, 655 S.W.2d 927, 928 (Tenn. 1983) (veterinarian threatening to kill dog unless owners paid bill); Goldfarb v. Baker, 547 S.W.2d 567, 568 (Tenn. 1977) (professor falsely accusing student of misconduct and ejecting him from class); Dunn v. Moto Photo, Inc., 828 S.W.2d 747, 749 (Tenn. Ct. App. 1991) (film developer falsely obtaining nude photo of plaintiff and entrusting it to fellow co-worker of plaintiff who displayed it at plaintiff's workplace). We do not disagree with the Court of Appeals' characterization of the facts of these prior cases. Yet these decisions do not compel us to conclude as a matter of law that no cause of action is available where the outrageous conduct was not in fact directed at a specific person. The Court of Appeals also found the directed-at requirement expressed as a matter of law in two Tennessee intermediate appellate court decisions. See Gann v. Key, 758 S.W.2d 538 (Tenn. Ct. App. 1988); Thomas Stidham v. Mediquick of Bartlett, Inc., No. 02A01-9102-CV-00014, 1991 WL 116558 (Tenn. Ct. App. July 2, 1991), *no Tenn. R. App. P. 11 application for permission to appeal filed*. However, a careful reading of these cases reveals that neither case clearly adopted the directed-at requirement.[17] To the contrary, Gann actually

---

[17]In affirming summary judgment for the defendant, the court in Stidham stated that "the alleged outrageous conduct in the instant case was not directed specifically toward the plaintiff." 1991 WL 116558, at *1. However, the court was here remarking on the character of the plaintiff's evidence and provided no clear holding of law on the directed-at issue.

-11-

acknowledges that outrageous conduct not specifically directed at a plaintiff could possibly be actionable.[18]

The Court of Appeals also relied on case law from other jurisdictions. Our research reveals that only six states have clearly decided that direct claims for intentional or reckless infliction of emotional distress must be based upon conduct that had been directed at a specific person or performed in the presence of the plaintiff: California, Georgia, Oregon, Pennsylvania, South Carolina and Washington. See Christensen v. Superior Court, 820 P.2d 181, 202-04 (Cal. 1991); Ryckeley v. Callaway, 412 S.E.2d 826, 829 (Ga. 1992); Meagher v. Lamb-Weston, Inc., 839 F. Supp. 1403, 1409 (D. Or. 1993) (applying Oregon law); Johnson v. Caparelli, 625 A.2d 668, 671-73 (Pa. 1993); Upchurch v. N.Y. Times Co., 431 S.E.2d 558, 561 (S.C. 1993); Reid v. Pierce County, 961 P.2d 333, 337 (Wash. 1998).[19] These decisions lack persuasive force. Some of the decisions provide little or no basis for their holdings. For example, in Ryckeley, the Georgia Supreme Court held that intentional infliction of emotional distress must be directed at the plaintiff, explaining without further elaboration that such a requirement is an "appropriate and logical corollary to the impact rule." 412 S.E.2d at 829-30. Similarly, in Johnson, the Pennsylvania Supreme Court simply pronounced without providing supporting analysis that direct claims under subsection 46(1) must

---

[18]Gann is a case in which the parents of a child abuse suspect who was murdered by the victim's grandfather sued various police agents for outrageously disseminating to the public false information about the suspect. 758 S.W.2d at 539-43. Although Gann states that the authorities which it cited involved "alleged outrageous conduct consist[ing] of acts or words directly and specially communicated to the injured party," id. at 546, the court goes on to say:

> In the present case the acts or words did not occur in the physical presence of plaintiffs nor were they specially directed toward plaintiffs as by mail. Nevertheless, *it is reasonable to concede* that the use of public communication, such as the news media, *would not immunize one who intentionally or recklessly inflicts serious emotional distress by acts or words which constitute outrageous conduct.*

Id. (emphasis added). The court affirmed summary judgment, finding that the defendants' conduct had not been outrageous and that the defendants lacked the intent to inflict emotional harm. Id. at 549.

[19]In a seventh state, Minnesota, the directed-at requirement for direct claims under subsection 46(1) must be inferred from the treatment of subsection 46(2) bystander claims. See Dornfeld, 503 N.W.2d at 118-20; see also infra. The Court of Appeals also cited to decisions of certain additional jurisdictions as requiring the directed-at element, but those decisions do not clearly support the proposition. See Culpepper v. Pearl St. Bldg., Inc., 877 P.2d 877 (Colo. 1994); Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62 (Tex. 1998). Further, in Witherspoon v. Philip Morris Inc., 964 F. Supp. 455, 463 (Dist. D.C. 1997) (applying District of Columbia law), a federal district court applying District of Columbia law expressly required the directed-at element. In a subsequent case, Loughlin v. United States, 209 F.Supp.2d 165, 174 (Dist. D.C. 2002) (applying District of Columbia law), *vacated by* --- F.3d ---, 2004 WL 2937278 (D.C. Cir. Dec. 21, 2004), a federal district court ostensibly following Witherspoon held that toxic contamination of a parcel of land by the United States military from 1917 to 1919 and the knowing sale years later of such land by American University enabled "any subsequent user of the land–a specific individual" thus exposed to the toxin to mount a claim for intentional infliction of emotional distress. The holding of Loughlin rendered unclear the true meaning of the directed-at element under District of Columbia law. However, the recent vacatur of Loughlin for lack of supplemental federal jurisdiction to decide tort claims based on District of Columbia law, 2004 WL 2937278, at *11-15, has nullified the Loughlin holding. Nevertheless, even though Witherspoon unambiguously required a claim for intentional infliction of emotional distress to be based upon conduct that was directed at a specific person, 964 F.Supp. at 463, the federal district court in Witherspoon focused solely on intent without expressly discussing recklessness, id.

-12-

be based upon conduct that had been directed at the plaintiff. 625 A.2d at 671.[20] Decisions from certain other jurisdictions suffer from fatal imprecision concerning matters central to their holding, typically by discounting recklessness[21] or by confusing direct and bystander claims.[22]

The California Supreme Court has provided the most cogent rationale for the directed-at requirement in Christensen, 820 P.2d at 201-04.[23] Christensen clearly holds that to mount a claim for intentional or reckless infliction of emotional distress, "[i]t is not enough that the conduct be intentional and outrageous. It must be directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." Id. at 202. More specifically, intentional misconduct must be directed at the plaintiff, while reckless misconduct must occur in the presence of the plaintiff of whom the defendant is aware. Id. at 203-04. In Christensen, the Court was concerned above all with setting limits on the scope of recovery, and to support its holding the Court looked to the traditional characterization of outrageous conduct as an intentional tort. Id. at 203 ("[T]he tort is properly categorized as intentional infliction of emotional distress, and presupposes action directed at the plaintiff or undertaken with knowledge that the plaintiff will suffer emotional distress."). The Court further reasoned that the directed-at and presence requirements are what "distinguish[] intentional infliction of emotional distress from the negligent infliction of such injury." Id. at 202 (citing Ochoa v. Superior Court, 703 P.2d 1 (Cal. 1985)).[24]

---

[20]In Johnson, the Pennsylvania Supreme Court stated that Second Restatement subsection "46(1) applies to situations in which a person suffers severe emotional distress as a result of outrageous conduct which is directed at that individual." 625 A.2d at 671. However, the Court's holding and the remainder of its discussion concern *bystander* actions under subsection 46(2). Id. at 671-73. Johnson fails to explain why direct claims under subsection 46(1) must be based on conduct that had been directed at the plaintiff.

[21]For example, in Meagher, a federal district court applying Oregon law incorrectly predicated the cause of action solely upon intent, failing to recognize recklessness as an available means for satisfying the state-of-mind element. See 839 F. Supp. at 1408-09; contra Hammond v. Cent. Lane Communications Ctr., 816 P.2d 593, 598 (Or. 1991) ("A plaintiff may recover for severe emotional distress without accompanying physical injury by showing recklessness or a reduced level of intent . . . ."). Similarly, in Dornfeld, a decision based on a subsection 46(2) bystander claim, the Minnesota Supreme Court focused too heavily on the intentional aspects of recklessness. 503 N.W.2d at 118-19 ("Thus, in order to hold [the defendant] liable for reckless infliction of emotional distress, this court must find that his actions were *intentionally* 'directed at' [the plaintiff's] husband.") (emphasis added). Dornfeld thereby problematically characterized recklessness as a state of mind which not only can but must be directed at a specific individual.

[22]The Washington Supreme Court in Reid imported into subsection 46(1) direct claims the additional requirements normally triggered only by subsection 46(2) bystander claims. 961 P.2d at 337.

[23]The South Carolina Supreme Court adopted the holding of Christensen in Upchurch, 431 S.E.2d at 561.

[24]It is instructive to note that Christensen falls within the context of California's trend of retrogression toward traditional, conservative limitations on tort recovery for negligent infliction of emotional harm, see Dobbs § 309, at 840-41, which runs counter to Tennessee's general negligence approach to negligent infliction of emotional distress adopted in Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996).

A problem common to most, if not all, of the decisions holding that reckless infliction of emotional distress must be based upon conduct that was directed at a specific individual or that occurred in the presence of the plaintiff is the failure to pay adequate attention to the unique nature of recklessness. An action predicated *ab initio* upon recklessness, such as reckless infliction of emotional distress, is unusual in tort law because the fundamental analysis involves aspects which resemble both negligence and intent. Restatement (Third) of Torts § 2 cmt. b (Tentative Draft No. 1, 2001) ("While there are general rules exposing persons to liability who cause harm intentionally or negligently, there is no similar general rule subjecting to liability the person who causes harm recklessly."); Dobbs § 27, at 51 ("Courts often recognize a kind of third category of fault that is distinguishable from both intent and from negligence. This category is called recklessness or willful and wanton misconduct. Not surprisingly, reckless conduct resembles both intentional conduct and negligence, so this category adds a degree of confusion or uncertainty."); W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 34, at 212 (5th ed. 1984) (stating that the "penumbra" of recklessness or "quasi-intent" lies between the doctrines of intent to do harm and ordinary negligence).

When it comes to the state-of-mind element of outrageous conduct,[25] courts have often failed to distinguish adequately recklessness from intent, thereby rendering recklessness ineffective as an independent predicate for satisfying the state-of-mind element.[26] By requiring the tortfeasor's reckless misconduct to take place in the immediate presence of a plaintiff of whom the defendant is aware, the majority position in Christensen, 820 P.2d at 201-04, indeed reduces recklessness virtually to the same scope as intentional conduct. See Christensen, 820 P.2d at 205 (Mosk, J., concurring and dissenting) ("[T]he majority's requirement that defendants consciously direct outrageous conduct at plaintiffs makes the 'recklessness' prong indistinguishable from the 'subjective intent' prong.").

Courts are not alone in failing to distinguish adequately recklessness from intent. Section 46 of the Second Restatement has similarly provided an insufficient treatment of recklessness within the context of the tort of outrageous conduct, thus itself serving as a source of confusion. Within the Restatements, reckless infliction of emotional distress developed as a matter of secondary importance.[27] Further, the Second Restatement position on reckless infliction of emotional distress

_____

[25]Although we refer to recklessness herein as a state-of-mind element, to be precise, recklessness as an element applies both to state of mind and to conduct.

[26]Gann confuses recklessness with intent in such a manner, incorrectly describing the standard as "intent to do serious emotional injury to the plaintiffs, or [acting] with such recklessness as to impute such an intent." 758 S.W.2d at 547.

[27]In section 46 of the original Restatement of Torts (1934) ("First Restatement"), as a general rule no liability arose from "conduct intended to cause emotional distress only." A 1948 Supplement to the First Restatement amended section 46, recognizing a general cause of action for "conduct intended to cause emotional distress only." First Restatement (Supp. 1948) (hereinafter "1948 Supplement") (reproduced in Restatement (Second) of Torts § 46 (Preliminary Draft No. 1, 1955)). However, the 1948 Supplement excluded recklessness, conceiving of the tort as purely

(continued...)

is hampered by internal inconsistencies. Section 46 cross-references the definition of recklessness provided in Second Restatement section 500, Second Restatement § 46 cmt. i, but this definition contemplates recovery solely for physical harm, whereas section 46 allows recovery for emotional harm standing alone without physical impact or manifestation. Compare Second Restatement § 46 with Second Restatement § 500 ("The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of *physical harm* to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.") (emphasis added). More significantly, applying the Second Restatement's directed-at criterion to recklessness necessarily confines and erodes the general nature of recklessness as defined in section 500.[28]

In Tennessee, reckless misconduct generally has not been perceived as conduct which must be directed toward specific, pre-identified victims. In Hodges v. S.C. Toof & Co., this Court explained that a person engages in reckless misconduct "when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." 833 S.W.2d 896, 901 (Tenn. 1992); see also Brown v. Hamilton County, 126 S.W.3d 43, 49-50 (Tenn. Ct. App. 2003) (applying the Hodges definition of recklessness to a civil claim outside the context of punitive damages). To "disregard" means "to give no thought to: [to] pay no attention to." Webster's Third New Int'l Dictionary 655 (1971). By contrast, to "direct" action to or toward a person or object means "to aim fixedly: [to] concern or involve oneself primarily or totally" with the target of one's action. Id. at 640. Recklessness as *conscious* disregard requires that the actor be aware of a substantial and unjustifiable risk of harm. However, as conscious *disregard*, recklessness cannot require that the actor aim the conduct toward a specific person or a specific result, for to do so would contradict the inattentive and thoughtless nature of disregard. In short, the directed-at requirement is incompatible with the concept of recklessness insofar as reckless misconduct has a general or random quality. James B. Brady, Recklessness, Negligence, Indifference, and Awareness, 43 Mod. L. Rev. 381, 386 (1980) ("If the actor aims at the consequences, then even if the expectation of the consequences is slight, he acts intentionally rather

---

[27](...continued)
an intentional one. In 1965, the Second Restatement recognized reckless as well as intentional infliction of emotional distress. See supra. Yet the case law which Second Restatement section 46 draws upon for its illustrations was on average decided in 1934, a time when reckless infliction of emotional distress was apparently seldom cognizable and intentional infliction of emotional distress was itself in a relatively embryonic stage of development. See generally Calvert Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv. L. Rev. 1033, 1059 (1936) ("*In a further stage of development*, *cases might arise* where liability would be imposed, though the defendant did not act for the purpose of causing the mental disturbance, but realized, or perhaps should have realized, that such a consequence would almost surely follow.") (emphasis added).

[28]The Second Restatement's own definition of recklessness as acts or omissions committed in *reckless disregard* of an unreasonable risk that was known or should have been known, Second Restatement § 500, contradicts the concept of action that is *specifically directed at a particular individual*. See Second Restatement § 500 cmt. d (It is not necessary "that the actor know that there is anyone within the area made dangerous by his conduct. It is enough that he knows that there is a strong probability that others may rightfully come within such zone.").

-15-

than recklessly. From a negative viewpoint, then[,] desire *for* the possible consequences is necessarily excluded from the concept of recklessness."); cf. State v. Payne, 7 S.W.3d 25, 29 (Tenn. 1999) (The criminal offense of reckless endangerment "can be committed against the public at large . . ." if members of the public are in close enough proximity that there exists a reasonable probability of death or serious injury.); Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc., 878 S.W.2d 934, 938 (Tenn. 1994) ("Driving while intoxicated on a public highway is gross negligence, or recklessness, given the significant risk of serious bodily injury or death, not only to the intoxicated driver, but [also] to unsuspecting motorists and pedestrians.").

Recklessness is a hybrid concept which resembles both negligence and intent, yet which is distinct from both and can be reduced to neither. "A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result." Hodges, 833 S.W.2d at 901. Although the reckless actor intends to act or not to act, the reckless actor lacks the "conscious objective or desire" to engage in harmful conduct or to cause a harmful result. See State v. Kimbrough, 924 S.W.2d 888, 891 (Tenn. 1996) ("[R]ecklessness and negligence are incompatible with desire or intention."); Dobbs § 147, at 351 (The reckless actor "does not intentionally harm another, but he intentionally or consciously runs a very serious risk with no good reason to do so."). Nevertheless, recklessness contains an awareness component similar to intentional conduct which is not demanded of negligence. See Dobbs § 147, at 351 (Recklessness "entails a mental element that is not necessarily required to establish gross negligence."); Brady, at 384 ("The element of awareness of risk . . . does distinguish between recklessness and negligence."). Further, although recklessness is typically a criterion for determining whether punitive damages are warranted in negligence cases, cf. Hodges, 833 S.W.2d at 901, claims for reckless infliction of emotional distress lack an underlying negligence claim. Therefore, a recklessness analysis is something unique which differs from analyses based strictly on either intent or negligence. Courts requiring the directed-at element generally have failed to recognize and to address the unique qualities of recklessness.

In addressing the unique nature of recklessness and the directed-at issue, we are confronted with three options. First, we could simply eliminate recklessness as a means for satisfying the state-of-mind element of outrageous conduct. See Alsteen v. Gehl, 124 N.W.2d 312, 317 (Wisc. 1963) (refusing to recognize recklessness as a predicate state of mind for the tort of outrageous conduct). Second, we could require that claims for reckless infliction of emotional distress must be based upon conduct that had been directed at a specific individual or that occurred in the presence of the plaintiff, thereby effectively collapsing recklessness into intent. See supra; see also Brady, at 394 (In applying the "aiming at" or directed-at requirement, "[t]he result is that every case of recklessness can be converted to 'intentionally exposing to the risk' and so the distinction between recklessness and intention is collapsed."). Third, we could reaffirm our recognition of infliction of emotional distress predicated upon recklessness and expressly reject the directed-at requirement. We choose the third option. Therefore, we hold that a claim of reckless infliction of emotional distress need not

be based upon conduct that was directed at a specific person or that occurred in the presence of the plaintiff.[29]

Our holding is consistent with Tennessee law and advances important policy considerations. First, the courts shoulder the responsibility of providing a remedy to those who have been wrongly injured. See Camper v. Minor, 915 S.W.2d 437, 441 (Tenn. 1996). To require a claim for reckless infliction of emotional distress to be based upon conduct that was directed at a specific individual would leave a gap in tort law where persons wrongly harmed would be deprived of a remedy. Cf. Christensen, 820 P.2d at 205 (Mosk, J., concurring and dissenting). Second, this Court has strongly affirmed the validity and significance of purely emotional harm as a basis for recovery, recognizing that emotional harm in the absence of physical impact can be as damaging if not more damaging than harm caused by physical impact. Medlin, 398 S.W.2d at 272-73. Third, we express confidence in the court system to winnow out false and frivolous claims through the pretrial and trial processes and through conscientious application of the elements necessary to establish causes of action for solely emotional harm.

The elements of intentional and reckless infliction of emotional distress themselves perform an important gatekeeping function for the purposes of ensuring the reliability of claims and of preventing liability from extending unreasonably. Cf. Miller, 8 S.W.3d at 612. The outrageous conduct requirement is a high standard which has consistently been regarded as a significant limitation on recovery. To qualify as outrageous, conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [i]ntolerable in a civilized community.'" Medlin, 398 S.W.2d at 274 (quoting Second Restatement § 46 cmt. d). In Miller, this Court pointed out that the outrageousness requirement is an "exacting standard" which provides the primary "safeguard" against fraudulent and trivial claims. 8 S.W.3d at 614 ("The risk of frivolous litigation . . . is alleviated in claims for intentional infliction of emotional distress by the requirement that a plaintiff prove that the offending conduct was so outrageous that it is not tolerated by a civilized society."). The mental harm which the plaintiff suffered also must be demonstrated to have been particularly serious.

Further, the state-of-mind element of intent or recklessness places significant limitation on recovery. Being required to prove the tortfeasor's intent or recklessness imposes a significantly higher burden than is required for mere negligence actions. See Christensen, 820 P.2d at 205 (Mosk, J., concurring and dissenting) (The tort of outrageous conduct "may be distinguished from negligent infliction of emotional distress . . . because recklessness requires a higher degree of fault than simple negligence."); Dobbs § 27, at 52. The recklessness element requires the defendant to be aware of, but consciously to disregard, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care which, under all the circumstances, an ordinary person would have exercised. Hodges, 833 S.W.2d at 901. The reckless tortfeasor will be liable only to persons who fall within the reasonably foreseeable scope of the particular substantial

---

[29]We express no opinion herein concerning whether claims of intentional infliction of emotional distress must be based on conduct that was directed at a specific individual.

and unjustifiable risk consciously disregarded by the tortfeasor.  See Tommy's Elbow Room v. Kavorkian, 727 P.2d 1038, 1044 (Alaska 1986) (holding that "in cases where the plaintiff alleges that the defendant acted recklessly, it must be shown that the defendant acted in deliberate disregard of a *high degree of probability that the emotional distress will follow*") (emphasis added); Public Fin. Corp. v. Davis, 360 N.E.2d 765, 767 (Ill. 1976) (holding that liability for reckless infliction of emotional distress "extends to situations in which there is a *high degree of probability that severe emotional distress will follow* and the actor goes ahead in conscious disregard of it") (emphasis added); cf. McClenahan v. Cooley, 806 S.W.2d 767, 775-76 (Tenn. 1991) (discussing foreseeability and proximate causation in the context of negligence actions).

We acknowledge that our holding herein eliminates the distinction between direct claims and bystander claims when the infliction of emotional distress claim is predicated upon recklessness. Under section 46 of the Second Restatement, the criterion by which direct and bystander claims are differentiated is the determination whether the misconduct was directed at the plaintiff or at a third party.  However, by holding that reckless infliction of emotional distress need not be directed at a specific individual, the criterion for differentiating between direct and bystander claims in that context is thus removed.[30]  Although this Court has never expressly recognized subsection 46(2) bystander claims, we note that subsection 46(2) involves the kind of arbitrary requirements which we analyzed and rejected within the context of negligent infliction of emotional distress in Camper, 915 S.W.2d at 440-46.[31]

## B.  Summary Judgment

Having held that reckless infliction of emotional distress need not be based upon conduct that was directed at a specific person or that took place in the presence of the plaintiff, we now address the plaintiffs' appeal of the lower courts' grant of summary judgment in favor of the Diocese. Summary judgment requires a demonstration that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Tenn. R. Civ. P. 56.04; Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993).  The moving party bears the initial burden of

---

[30]A further corollary is that the additional requirements of subsection 46(2) (contemporaneous presence and close relationship) will never be triggered for claimants under reckless infliction of emotional distress; in other words, all plaintiffs will necessarily be treated as direct claimants.  See Johnson v. Standard Fruit & Vegetable Co., 984 S.W.2d 633, 639-40 (Tex. Ct. App. 1997) (holding that a truck which careened into a parade after the driver fell asleep posed "a direct threat to all the marchers who conceivably could have encountered the tractor trailer plowing through their midst"), *overruled by* Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62 (Tex. 1998).

[31]Although Tennessee is one of an exceedingly small minority of jurisdictions which currently follow a general foreseeability approach for negligent infliction of emotional distress, Dobbs § 312, at 850-51; see Sacco v. High Country Indep. Press, Inc., 896 P.2d 411, 418 (Mont. 1995); Camper, 915 S.W.2d at 446, we think it unnecessary and unwise for Tennessee courts to abandon established precedent by following Sacco in merging intentional, reckless and negligent infliction into a single tort, wherein the higher levels of culpability serve merely to subject the defendant to punitive damages, Sacco, 896 P.2d at 428-29.  Causes of action in Tennessee for intentional, reckless and negligent infliction of emotional distress retain respectively distinct and logically appropriate requirements and burdens.

demonstrating that it has satisfied these requirements. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 88 (Tenn. 2000). When the burden of persuasion at trial falls on the nonmoving party, as in this case, the moving party must satisfy its initial burden either by affirmatively negating an essential element of the nonmoving party's claim or by conclusively establishing an affirmative defense. See McCarley v. West Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998); see also Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting). A moving party may accomplish this burden "with or without supporting affidavits," Tenn. R. Civ. P. 56.02, but mere conclusory assertions that the nonmoving party has failed to make its claims are insufficient, Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997). If the moving party fails to negate the claims at issue, the burden never shifts to the nonmoving party to produce evidence establishing the existence of a genuine issue for trial, and the motion for summary judgment must fail. Blair v.West Town Mall, 130 S.W.3d 761, 767-68 (Tenn. 2004).

However, if the moving party meets its initial burden, the nonmoving party may not simply rest upon its pleadings, but assumes the burden of producing evidence establishing the existence of a disputed fact relating to the essential elements of its claims. Staples, 15 S.W.3d at 89. The nonmoving party may meet this burden by:

> (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery . . . .

McCarley, 960 S.W.2d at 588 (citing Byrd, 847 S.W.2d at 216 n.6); see also Tenn. R. Civ. P. 56.06 (The nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."). The trial court "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." Byrd, 847 S.W.2d at 210-11. Further, summary judgment shall be denied if there is "'any doubt whether or not a genuine issue exists.'" McCarley, 960 S.W.2d at 588 (quoting Byrd, 847 S.W.2d at 211).

On appellate review of a summary judgment motion, we review the record de novo, according no presumption of correctness to the trial court's determination. Webber v. State Farm Mut. Auto. Ins. Co., 49 S.W.3d 265, 269 (Tenn. 2001). Further, we must view the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor and discarding all countervailing evidence. Shadrick v. Coker, 963 S.W.2d 726, 731 (Tenn. 1998). Summary judgment is inappropriate unless the facts and the conclusions to be drawn from them permit a reasonable person to reach only a single conclusion. Pero's Steak & Spaghetti House v. Lee, 90 S.W.3d 614, 620 (Tenn. 2002).

We begin our analysis by stating the requirements for reckless infliction of emotional distress. Three elements are required: first, the conduct complained of must have been reckless; second, the conduct must have been so outrageous that it is not tolerated by civilized society; third,

the conduct complained of must have caused serious mental injury. See Bain, 936 S.W.2d at 622. In order to mount a prima facie case, the plaintiff need not allege that the defendant's reckless misconduct had been directed at a specific person or that it had occurred in the plaintiff's presence.

In considering the Diocese's motions for summary judgment as to the plaintiffs' outrageous conduct claims, both the trial court and the Court of Appeals required reckless infliction of emotional distress to be directed at a specific individual. Were the directed-at requirement for reckless infliction of emotional distress applicable, the Diocese could potentially sustain a successful motion for summary judgment based on its Statement of Undisputed Material Facts filed in support of its motions for summary judgment. However, in light of our rejection of the directed-at requirement, a broader range of facts is material to determining whether the plaintiffs have established against the Diocese a prima facie case of reckless infliction of emotional distress.

Considering the record in a light most favorable to the plaintiffs, Staples, 15 S.W.3d at 89, there are several disputed or possibly disputed material facts concerning the Diocese's conduct and its awareness that McKeown presented a substantial and unjustifiable risk of harm to young males. The parties dispute whether Bishop Niedergeses or Father Giacosa became aware that McKeown, through habitual sexual predation, had molested a large number of boys and had committed sexual misconduct as recently as 1986. The parties dispute whether the Diocese failed to report or to investigate the known abuse and whether the Diocese failed to place effective restrictions on McKeown's contact with youth even after his sexual disorder became known. Similarly, disputes exist as to the nature of the Diocese's connection to McKeown after his removal from employment in 1989. There is dispute as to the proper characterization of the Diocese's payments to McKeown and as to whether the Diocese undertook but failed to continue to provide treatment in spite of knowing about McKeown's harmful tendencies. The parties dispute whether McKeown continued to have some official clerical status and what inferences are to be drawn therefrom. Also disputed is whether the Diocese knew of McKeown's inappropriate involvement with young males in the context of Diocesan programs even after McKeown was removed from his employment position in 1989.

These disputed issues are material to the plaintiffs' claims for reckless infliction of emotional distress and raise a genuine question for the trier of fact. See Byrd, 847 S.W.2d at 214-15. Consequently, the Diocese has failed to satisfy its initial requirement of demonstrating the absence of a genuine dispute of material fact with respect to the elements of the plaintiffs' reckless infliction of emotional distress claims. See McCarley, 960 S.W.2d at 588. A grant of summary judgment concerning these claims is thus inappropriate. Therefore, as to John Doe 1, Jane Doe 1 and John Doe 2, we reverse the Court of Appeals' affirmation of summary judgment in favor of the Diocese, and we remand this case to the trial court for further proceedings consistent with this opinion.

## C. Motion to Compel Discovery

Decisions concerning pretrial discovery are matters of a trial court's discretion. Benton v. Snyder, 825 S.W.2d 409, 416 (Tenn. 1992); Boyd v. Comdata Network, Inc., 88 S.W.3d 203, 211

(Tenn. Ct. App. 2002). An appellate court, therefore, must review such decisions under an abuse of discretion standard. Benton, 825 S.W.2d at 416. A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party. Clinard v. Blackwood, 46 S.W.3d 177, 182 (Tenn. 2001) (citing State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

The trial court denied several parts of the plaintiffs' consolidated motion to compel the Diocese to respond to various discovery requests. The Court of Appeals stated that

> none of the discovery denied or limited by the trial court's order dealt with information that would establish the elements the trial court and this court have found missing in the plaintiffs' claim for intentional infliction of emotional distress through outrageous conduct. Consequently, the issue of the limitation of discovery is now moot in view of our holding [that intentional and reckless infliction of emotional distress must be based upon conduct that was directed at a specific individual].

However, given our rejection of the directed-at limitation on reckless infliction of emotional distress, this issue of discovery is no longer moot. Therefore, we review the trial court's determination of the matter.

The trial court applied a legal standard for reckless infliction of emotional distress which required the reckless misconduct to have been directed at the plaintiffs or the plaintiff to have had a close relationship to a third person at whom the misconduct was directed, a standard which we herein have rejected. A broader range of facts is likely to be material to reckless misconduct which need not be directed at a particular individual or occur in the plaintiff's presence than to reckless misconduct which must be so performed. Therefore, we vacate the trial court's denial of the plaintiffs' motion to compel discovery insofar as the denial pertains to discovery requests affected by our rejection of the directed-at requirement for reckless infliction of emotional distress. We remand this matter to the trial court for reconsideration of the discovery requests in light of and in a manner consistent with this opinion.

### III. Conclusion

We hold that a claim for reckless infliction of emotional distress need not be based upon conduct that was directed at a specific person or that occurred in the presence of the plaintiff. The holding of the Court of Appeals in this regard is therefore reversed. Concerning the Diocese's motions for summary judgment in this case, we find that the Diocese failed to satisfy its initial requirement of demonstrating that there is no genuine issue of material fact remaining to be decided. Therefore, we reverse as to all plaintiffs the lower courts' grant of summary judgment in favor of the Diocese. Further, we vacate the trial court's partial denial of the plaintiffs' motion to compel discovery. We remand this case to the trial court for further proceedings consistent with this opinion,

including reconsideration of the plaintiffs' discovery requests.  Costs of this appeal are taxed to the defendant, the Diocese.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE