IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 22, 2011 Session

## RONDAL AKERS, ET AL. v. PRIME SUCCESSION OF TENNESSEE, INC., ET AL.

**Appeal from the Circuit Court for Bradley County**
**No. V-02-623      Neil Thomas, III, Judge Sitting By Interchange**

**No. E2009-02203-COA-R3-CV-FILED-OCTOBER 17, 2011**

This case is before us for the second time on appeal. In our first Opinion, *Akers v. Buckner-Rush Enterprises, Inc.*, we held, *inter alia*, that Rondal D. Akers, Jr. and Lucinda Akers had standing to pursue their claims against T. Ray Brent Marsh; Marsh's former business, Tri-State Crematory ("Tri-State"); and Buckner-Rush Enterprises, Inc.[1] *Akers v. Buckner-Rush Enterprises, Inc.*, 270 S.W.3d 67, 73-75 (Tenn. Ct. App. 2007). We remanded the case for trial. The Trial Court entered judgment upon the jury's verdict finding that Marsh had intentionally inflicted emotional distress upon the Akers, that Marsh had violated the Tennessee Consumer Protection Act, and that Marsh had violated a bailment responsibility to the Akers. The jury awarded Dr. Akers $275,000 in damages and Mrs. Akers $475,000 in damages. Marsh filed a motion for new trial or for judgment notwithstanding the verdict. After a hearing, the Trial Court granted Marsh a partial judgment notwithstanding the verdict reversing the judgment for the claims under the Tennessee Consumer Protection Act and bailment, and denied Marsh's motion as to the remaining claims. Marsh appeals to this Court. The Akers raise an issue on appeal regarding whether the Trial Court erred in granting judgment notwithstanding the verdict and dismissing their claims under the Tennessee Consumer Protection Act and bailment. We affirm the judgment in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, J.J., joined.

---

[1] The Akers' claims against Prime Succession of Tennessee, Inc.; Buckner-Rush Enterprises, Inc.; and Prime Succession Holding, Inc. were settled prior to trial. The Akers non-suited their claims against Tri-State.

Stuart F. James, Chattanooga, Tennessee, for the appellant, T. Ray Brent Marsh.

William J. Brown, Cleveland, Tennessee, for the appellees, Rondal Akers and Lucinda Akers.

**OPINION**

**Background**

Rondall Akers ("Deceased") died on November 23, 2001. Funeral arrangements for Deceased were made with the Buckner-Rush Funeral Home ("the Funeral Home") in Cleveland, Tennessee. Deceased's father, Rondal D. Akers, Jr. ("Dr. Akers"), signed the contract ("the Contract") for funeral services with the Funeral Home. Both Dr. Akers and his wife, Deceased's mother, Lucinda Akers, signed a three page document titled "Cremation and Disposition Authorization" ("Authorization"). Deceased's body was embalmed and after a funeral service was taken to Tri-State for cremation. It is unknown what happened to Deceased's body after it was taken to Tri-State, but Marsh delivered what was purported to be Deceased's cremains ("Cremains") to the Funeral Home who in turn gave the Cremains to the Akers in accordance with the Contract and Authorization between the Funeral Home and the Akers.

In pertinent part, the Authorization signed by Dr. and Mrs. Akers provides:

Cremation is performed to prepare the deceased for memorialization. The funeral home places the human remains of the decedent in a combustible casket or other container and delivers it to the Crematory. The Crematory then will put the casket or container and the human remains into a cremation chamber. Incineration of the container and contents is accomplished by substantially increasing the temperature in the cremation chamber until combustion is obtained. After approximately one and one-half hours, all substances are consumed or driven off, except bone fragments (calcium compounds) and metal, as the temperature is not sufficiently high enough to consume them.

"The human body burns with the casket, container, or other material in the cremation chamber. Some bone fragments are not combustible at the

-2-

incineration temperature and, as a result, remain in the cremation chamber. During the cremation, the contents of the chamber may be moved to facilitate incineration. The chamber is composed of ceramic or other material which disintegrates slightly during each cremation and the product of that disintegration is commingled with the cremated remains. Nearly all of the contents of the cremation chamber, consisting of the cremated remains, disintegrated chamber material, and small amounts of residue from previous cremations, are removed together and crushed, pulverized, or ground to facilitate inurnment or scattering. Some residue remains in the cracks and uneven places of the chamber. Periodically, the accumulation of this residue is removed and interred in a dedicated cemetery property, or scattered at sea."

Due to the nature of the cremation process, any personal possessions or valuable materials, such as dental gold or jewelry (as well as body prostheses or dental bridgework), that are left with the decedent and not removed from the casket or container prior to cremation will be destroyed or will otherwise not be recoverable. As the casket or container will usually not be opened by the Crematory, the Authorized Agent(s) understands that arrangements must be made with the Funeral Home to remove any such possessions or valuables prior to the time that the decedent is transported to the Crematory.

Following an appropriate cooling period, the cremated remains are swept or raked from the cremation chamber. The Crematory makes all reasonable efforts and uses its best efforts to remove all of the cremated remains from the cremation chamber, but it is impossible to remove all of them, as some dust and other residue from the process are always left behind. In addition, while every effort will be made to avoid commingling, inadvertent or incidental commingling of minute particles of cremated remains from the residue of previous cremations is a possibility, and the Authorized Agent understands and accepts this fact.

After the cremated remains have been processed, they will be placed into a designated urn or container. The Crematory will make a reasonable effort to put all of the cremated remains in the urn or container, with the exception of dust or other residue that may remain in the processing equipment. The Funeral Home or the agent of the Funeral Home will pick up the urn/container containing the cremated remains and deliver/dispose of it as directed by the Authorized Agent.

(quotation marks in original).

It was discovered by the authorities in February of 2002 that Marsh was accepting bodies for cremation, but not necessarily cremating them. Instead, Marsh was burying or dumping the bodies on Tri-State property. The Akers surrendered the box that contained the Cremains to the Georgia Bureau of Investigation ("GBI") and were informed that the box did not contain cremains, but instead contained potting soil. It later was discovered that the box did contain human cremains.

Deceased's body was not among those found on the Tri-State property during the GBI investigation. At the time of his death, Deceased was a 34 year old, Caucasian male, who was five feet ten inches tall and weighed 300 plus pounds. Deceased had short, clean cut black hair with no gray, a Vandyke beard and mustache, a left ear piercing, and a tattoo on his left breast of a Greek symbol.

In our Opinion in *Floyd v. Prime Succession of TN*, we discussed what happened to Marsh as a result of his actions described above. *Floyd v. Prime Succession of TN*, No. E2006-01085-COA-R9-CV, 2007 WL 2297810 (Tenn. Ct. App. Aug. 13, 2007), *no appl. perm. appeal filed*. We noted that a Georgia grand jury returned 787 criminal indictments against Marsh pertaining to the over 200 bodies that had been identified. The indictments did not cover the roughly 110 bodies that were not or were unable to be identified. *Id*. at *2. Marsh pled guilty in Georgia to multiple felonies including 122 counts of burial service fraud, 47 counts of false statement, 179 counts of abuse of a dead body, and over 400 counts of criminal intent theft by taking. The plea agreement accepted by the Walker County Superior Court provided as follows:

> [The State of Georgia] would recommend in this case that the defendant be sentenced to serve twelve years in prison, that he shall also be given a concurrent term of probation of 75 years and that as a condition of probation that he pay a fine of 20 thousand dollars and that the payment of the fine commence within one year after his release from incarceration and that he pay the fine and attendant costs at the rate of one thousand dollars per year under the supervision of the probation officer and we would request that the defendant be directed to hand-write a letter of apology to be delivered to a designated representative for each of the identified remains in this case. The letters would be turned over to the probation office for mailing to their ultimate destinations. We would ask the court to direct the defendant to write a general letter of apology. These would not be due until six months after the commencement of the sentence itself.

The defendant would pay restitution to the State of Georgia in the sum of eight million dollars in the event that the defendant shall either directly or indirectly attempt to profit or benefit in any manner from any transaction arising out of the sale of his story, so to speak, regarding these events.

The defendant shall be on unsupervised probation after the final payment of any and all fines and court costs and the sentence shall be concurrent with any other sentence he may receive in the State of Tennessee arising out of this and the period of incarceration shall begin sometime after January 1st of 2005.

*Floyd*, 2007 WL 2297810, at *3.

Following Marsh's guilty plea in Georgia, he pled guilty to numerous criminal charges brought against him by the State of Tennessee. Specifically with regard to Deceased, Marsh pled guilty in Tennessee to the crime of criminal simulation, Tenn. Code Ann. § 39-14-115. In pertinent part, Tenn. Code Ann. § 39-14-115 provides:

**39-14-115. Criminal simulation.** – (a) A person commits an offense of criminal simulation who:

(1) With intent to defraud or harm another:

(A) Makes or alters an object, in whole or in part, so that it appears to have value because of age, antiquity, rarity, source, or authorship that it does not have;
(B) Possesses an object so made or altered, with intent to sell, pass, or otherwise utter it; or
(C) Authenticates or certifies an object so made or altered as genuine or as different from what it is; or

* * *

(c) Criminal simulation is punishable as theft pursuant to § 39-14-105, but in no event shall criminal simulation be less than a Class E felony.

Tenn Code Ann. § 39-14-115 (1989). Marsh received a total sentence of nine years in the Tennessee criminal cases. *Floyd*, 2007 WL 2297810, at *3. The nine-year sentence in

Tennessee was to be served concurrently with the twelve-year sentence in Georgia.

The case now before us was tried to a jury in April of 2009. Greg Ramey, the lead criminal investigator for the GBI, testified at trial. On February 15, 2002, Agent Ramey received a call from the coroner requesting GBI assistance with regard to a complaint about Tri-State. Agent Ramey went to the site and began an investigation. Marsh told Agent Ramey that he had taken over the business when Marsh's father became ill in late 1996 or early 1997.

Agent Ramey described the conditions found at Tri-State including what he referred to as surface burials, trash pits that contained bodies, and a location where an old billiard table had been placed on top of several bodies. He stated that human remains were discovered in "virtually all the buildings that we opened up." A body was discovered inside a hearse. Another was found inside a van. Some bodies were found without arms and legs, and other bodies were found that had been partially cremated. A body was found in the retort[2] and there was no evidence that any attempt had been made to cremate this body.

The GBI made 339 recoveries at Tri-State. Agent Ramey explained:

There was some confusion mainly because of the way the media represented it. Everybody was told we had 339 bodies, which, we had 339 recoveries. And when I say recoveries, if we had a skull and it was laying right here, and ten feet away we had an upper torso, and ten feet away a [sic] we had a lower torso, probably in our mind we're thinking those three all belong together because each is missing a specific part, but until we can properly identify them, this had to be a recovery, this had to be a recovery, and this had to be a recovery.

So they're separate recoveries. And that reflected sometimes in our report on here where we might have a body that was listed as two or three different numbers or sometimes two or three different numbers, and even to the point where during the recovery effort we began to find just the large bones of the legs, the upper legs, the lower legs, and the arms, so instead of giving them a recovery number like 34 or 35, what we had to do is give those a four-digit number.

So sometimes you may see a recovery effort that may list Body Number 200, but it also have [sic] a four-digit number associated with it, or you may

_____

[2]The crematorium oven is also referred to as a 'retort.'

have a recovery effort listed as 318, 315, and 314, which tells me the body had become disarticulated. It was separated, but we were able to recover it and put it all back together. So realistically probably the recovery number of bodies is more in the high 320s, after we were able to put some of the body parts back together and make an identification.

There were some bodies that could not be identified. Agent Ramey testified:

We identified 226 bodies or body parts. Okay. Some people that were identified all we were able to identify was like the big leg bones of the body. We had some that were only two bones, two major bones of the body, but they were identified through DNA. So we know we had a positive match on them. We identified 226 individuals that way.

Roughly we had about 110 or so bodies or body parts that were unidentified. Now, some are very identifiable. I would have in my sincerest thoughts believed that we would have gotten those folks identified, but at the same time a large number of the bodies were elderly people who may or may not have had family or family living, who may not have had any relatives around here. Some people genuinely - - we called or contacted them to supply DNA so we could make identifications - - asked not to be included.

So we very well may have some people still right now that we could identify if some of their family members would have submitted DNA, but for whatever reason they chose not to and that happened quite a few times, probably 25, 30, maybe 40 times that people just didn't want to be included in this.

The unidentified bodies have been buried in Walker County, Georgia.

The GBI determined that during the time that Marsh was involved in the crematory there were a little over 1,100 bodies sent to Tri-State. The GBI assumed that bodies not found at Tri-State were cremated, but Agent Ramey stated: "That's an assumption."

During the investigation Agent Ramey walked around the Tri-State property with Marsh and Marsh identified two bodies lying next to one another and "called out the name Akers." Agent Ramey stated: "His problem was he did not - - he didn't have enough records or didn't take enough time. It was very obvious to us very quickly he didn't know who most of these bodies were."

Agent Ramey was asked about a day when the attorneys in the civil cases were permitted to visit the Tri-State property after the GBI had concluded their investigation. During that visit, Dr. William M. Bass, a forensic anthropologist, identified bone fragments outside the retort. Agent Ramey agreed that despite the best efforts of the investigators remains were still being found. Agent Ramey stated that this "happened shortly after we left the crematory property," and further stated: "I'm sure we may have left some bone fragments there." Agent Ramey stated:

> I agree there were human remains out there, but they were unidentifiable. They are finger bones, small finger bones. When the flesh comes off of it, it's probably a third of the size of a diameter of a pencil and there's no discernible DNA that can be taken from it. It's a human recovery, but it's unidentifiable. There's no way to attribute it to a single body, to anybody.

Hugh E. Berryman, a board-certified forensic anthropologist, testified as an expert witness for Marsh. Dr. Berryman described to the jury how a cremation burns the body. Dr. Berryman testified that he spent a good part of a day examining the Cremains. In the Cremains, Dr. Berryman found human bone and "other artifacts, I would say, pieces of metal, buttons, and there was some sternal chest wire, from - - very likely from a surgery." Dr. Berryman examined the bone closely and determined that it was human bone. He described the other artifacts as a staple, a cylinder piece of metal, and small springs and stated that he had no idea where the cylinder piece and springs came from or what they were. Dr. Berryman also found five snaps that said "backyard blue," which he later discovered came from a pair of blue jeans. The parties stipulated that the Cremains contain a rivet from a pair of Wal-Mart blue jeans. With regard to the sternal chest wire, Dr. Berryman stated:

> Now, the sternal, the word sternal comes from the sternum or breast bone. When they do open-heart surgery, they saw the middle of the sternum, they saw down that bone and they open the chest up, do what they're going to do, and then they - - when they finish, they suture the skin and so forth, but the bone - - since there's a lot of stress - - when you pick things up, there's a lot of stress that goes to the chest, so they actually wire that together with stainless steel wire, and it's wrapped around the bone, and it's twisted and just pressed down.

> In fact, this is a great tool for making positive identifications. I've used it several times. We'll have an unknown individual and a suspect, that we have X-rays of the suspect, and he has these chest wires and you can see them. There's a series of these wires right down the bone. Now, since this is random, as to how many times they twist this piece of wire and press it down,

then you have a sequence of random shapes. It's almost like a Social Security number or something. And you can - - it's just a great ID. You can match those things up, the twists in the wire, the way they're pressed down, one after the other, all the way down, and get a positive ID of an individual. So I've used - - I've seen this many, many times.

The parties stipulated that some of the items found in the Cremains were sternum sutures, and that the two filaments and the metal stud were associated with a pacemaker. When asked what that suggested to him, Dr. Berryman stated:

[T]hat would suggest that their chest had been open for some reason, and again, I didn't know the two filaments and the little wire that you called were supposed to be the pacemaker, but if it is, then I would assume that we're dealing with someone that had heart problems.

Dr. Berryman concluded that the Cremains are human cremains. Dr. Berryman, however, could not state whether the Cremains were Deceased, or were not. Dr. Berryman testified:

And it was apparent to me when I looked in the [Tri-State] retort and I looked at the floor that it would be very, very difficult to cremate one individual in there, to remove the bones just from that one individual. Because the floor was in such a terrible condition that it would be hard to remove one individual without commingling or mixing the previous individual or three individuals ago, that pieces of bone, teeth were left behind. Wire, others [sic] things may have been left behind.

Dr. Berryman stated: "from what I know of Rondal Akers, I found things in those cremains that didn't belong in there." When asked if a family who receives cremains has to rely upon the integrity of the entity performing the cremation, Dr. Berryman agreed since it is not possible to determine if cremains belong to a certain person. He stated: "I would have to depend on someone telling me who's in there." Dr. Berryman's opinion that the Cremains are human is based upon his examination of the bone fragments found in the Cremains.

Dr. Berryman was asked if it were possible to determine whether a specific set of cremains came from a specific individual, and he stated:

I don't know of any way of determining the cremains themselves. And even when you have a name tag in there, you rely on how accurate the person is who put that piece of paper in there.... I could tell you there's human bone in there,

but as to whether it's Mr. Akers or not I have no way of knowing if that's Mr. Akers.

When he looked at the floor of the Tri-State retort and realized what was going on Dr. Berryman visited another crematorium, East Tennessee Crematorium Company ("East Tennessee"), to watch a cremation and understand how it was being accomplished. He stated: "I wanted to observe what they do when they cremate someone, step by step, just to get a good understanding of how it's done and the equipment that's used and what the expectations at a crematorium that really a quality crematorium, how they do things."

Photographs of the Tri-State retort were introduced at trial. Dr. Berryman examined the retort approximately one year after the GBI investigation. Dr. Berryman explained that he excavated the retort floor and found bones, teeth, and metal from cremations. He found 69 different items exposed on the floor that he was able to pick up with his fingers. Dr. Berryman explained that the retort at East Tennessee had a very smooth concrete floor. In contrast, the floor at Tri-State was "a sand-like material, basically, and as far as how soft that material was - - this was supposed to be a concrete floor." Dr. Berryman also found raccoon footprints inside the retort and stated that even though the door was closed and they had a problem getting it open, a raccoon had gotten into the retort.

Dr. Berryman further described the surface of the Tri-State retort stating: "if you look at the surface, what the surface looked like, it's a very undulating surface." He excavated the retort floor in layers and found "a lot of moisture … basically from body fat over the years." Dr. Berryman found a four inch bone partly burned away. He also found such things as a metal bracket with four screws, a wood screw, rusty flakes of metal, and a rusty tack. Dr. Berryman found over 100 staples in the Tri-State retort floor. When asked further about the types of items he found in the Tri-State retort, Dr. Berryman testified:

There were quite a few bone fragments or pieces of bone, and some of the bone I could recognize as thoracic vertebrae, transverse process, a phalanx of the thumb, specifically, one of the bones from the thumb. So it went from that to just bone fragments that I couldn't identify. And then you also had other items like the sternum wire was in there. We found evidence of hair in there, unburned hair. Metal staples, we found quite a few metal staples. And I think there was a stone, a little rock or something found in there or something along that line…. I'm looking for - - a feather, did I mention feather? I found a feather. I'm looking for buttons. Found a screw. I don't see button listed. There's at least one row I can't read down here. And I don't recall if we did find any.

-10-

Dr. Berryman did not find any blue jean rivets in the retort.

Dr. Berryman described the tools that were used at Tri-State stating:

There are some tools that look - - I saw some when we were out there - - to me, look very primitive. There's one that's like a handle that's 8 feet long. It's like a hoe that was used.… And so it just seems like it would just be difficult, considering what the floor looked like, to use those tools to get that stuff out.

Dr. Berryman stated: "I examined two wood chippers that were associated with Tri-State, and on both of those wood chippers I found material that is consistent with cremains. So the assumption is that those were used in some fashion to pulverize bone."

Dr. Berryman testified in detail about his visit to East Tennessee stating:

I went to see - - this was a quality operation, and so I wanted to go in and see, start to finish, how they did cremations. And I wanted to look at the type of equipment they used. In fact, it was a very good experience. They had two retorts. One was a new one. One was, I believe, 25 years old, and it was exactly the same as the one at Tri-State. It - - only it was in great shape. The floor was really smooth. And you know, it just gave me a great opportunity to see - - and in fact, while I was there, they cremated one individual in that retort, so I got to see that operate. And again, they have doors on there, or little windows, and you can look in and see what's going on during the cremation.

Photographs that Dr. Berryman took of the cremation he witnessed at East Tennessee were introduced at trial. When asked what the purpose was of observing at East Tennessee in relation to his excavation of the Tri-State retort, Dr. Berryman explained:

Again, I want - - back to protocol and how someone does something and the shape of the floor, what kind of condition the floor is in in another retort, just to get a range of comparison, one I know is doing an expert job, and then compare that with Tri-State, which, obviously, had problems.

Dr. Berryman did not witness any commingling of other materials such as metal during the cremation at East Tennessee. Dr. Berryman agreed that East Tennessee met the standards for performing cremations contained in the Authorization that the Akers signed.

When asked about the condition of the Tri-State retort floor after he finished his excavation, Dr. Berryman stated:

> I have some photographs of that, as well. When I go[t] through the material I could brush away, the material that I could excavate with a trowel, and got down to just what was left of the concrete - - I assume the original concrete, it looked like it had been there for a long time, it was - - the surface was - - it had pockets, it had fisher [sic] running through it, and some of the fishers [sic] were 2 inches deep. It was just - - it was - - you know, it was just amazing, the floor, it was in terrible shape.

Dr. Berryman introduced more photographs of the Tri-State retort and further explained:

> I had taken - - I had taken this down - - again, all the way down to the material I just couldn't move with the trowel. It's concrete, and I assume the original concrete underneath all that. And you have these fishers [sic] that run across this thing, and these - - like I said, some of these are like 2 inches deep. And again, this goes back - - that's the underlying surface, and there was, again, material over that, sand or whatever that material was, a very - - a loose material. And this just goes back to - - to emphasize, when I first looked in that and I'm thinking, no wonder you get things mixed up. How can you cremate one person in there and know that you removed all of that person and no one else? And how can you - - after you do two or three in a row, how do you know that you're not incorporating things like - - for example, when I was in there excavating, I found that sternal wire, an indication - - we talked about today, there was [sic] two sternal wires in there. So how - - you know, that sort of thing didn't belong in this one, but how do I know it was not accidentally incorporated into this one just in trying to clean out the remains - - what remained from that cremation?

When asked his opinion of commingling at Tri-State, Dr. Berryman stated:

> I think it - - even with your best attempts, I think, it would be very difficult to remove cremains from one individual out of Tri-State retort without mixing them with previous individuals…. It would be almost impossible. I don't know how one individual could clear that out, one individual out of there without accidentally leaving part of that individual behind and also accidentally incorporating other individuals, wires, metals, maybe, from a previous cremation into that.

-12-

GBI recovery efforts at Tri-State included, among other things, cutting down and removing the trees and draining a lake on the property. In April of 2005 "everything [at Tri-State] was being dozed down." Some of the buildings had been removed and more bones were found. Dr. Berryman testified that the few bones found represented two individuals, but he did not believe either of those individuals was Deceased. After everything was cleared out and GBI had released the site, Dr. Berryman and others did a line search looking for surface remains or a grave that had been dug on the Tri-State property.

Dr. Berryman was asked about a specific photograph depicting human remains found at Tri-State and he stated:

> This represents burned remains. It indicates apparently there were some cremations - - it looks like an attempted cremation.… It looks like a cremation that was incompletely done or attempted and for some reason it did not finish.… Let me also clarify if you will please, I'm looking at the bodies. The assumption is that they've been in the retort and this is why they're burned, and we had deceased individuals that was [sic] sent there that may have died in house fires and things like that. I want to make that distinction. I've gone in this file to know what the conditions were in that regard. If these were from the retort, if I can do that, then it looks to me like it was - - for some reason it was not complete. The bodies were burned, but not completely burned.

Dr. Berryman also testified about a telephone survey that he and a colleague conducted of several funeral homes in Tennessee and a few other states during which each of the funeral homes surveyed was asked questions about the tools they use during a cremation and whether commingling is an issue for them. The survey also asked for an opinion about how cremains could become mixed. The responses to the survey, which were introduced as exhibits at trial, stated answers to the question about how cremains become mixed such as cremating more than one body at a time, carelessness, improperly cleaning of the retort, and laziness or unethical and greedy behavior.

At trial, responses to interrogatories and requests for admissions propounded to Marsh were read. In this discovery, Marsh invoked his Fifth Amendment privilege as to a number of questions including whether the Tri-State retort was not operational in November of 2001, and what happened to Deceased's body. Marsh also invoked his Fifth Amendment privilege in response to requests for admissions regarding whether Deceased's body was turned over to Marsh in November of 2001 for purposes of cremation, and whether Marsh failed to properly dispose of the remains of Deceased's body, among others.

Marsh was in prison in Georgia during the trial. Portions of Marsh's

videotaped deposition were played during the trial. With regard to Marsh's invocation of his Fifth Amendment privilege, the Trial Court instructed the jury that it may give the response a negative inference, but was "not required to give the negative inference to a particular answer …," and that the negative inference could only be used where the Trial Court instructed, otherwise the jury could give the response the weight the jury thought it was entitled to. The Trial Court instructed that negative inference could be taken with regard to questions about whether the Cremains were Deceased or not.

Portions of the videotaped deposition of Dawn Palmer were played at trial. Ms. Palmer had been employed at the Funeral Home from April of 1996 through February of 2003 as a funeral director and embalmer. She is licensed in Tennessee and Georgia. Before working at the Funeral Home, Ms. Palmer had worked at Woodlawn Funeral Home, Chattanooga Funeral Home, and Lane Funeral Home.

Ms. Palmer had performed cremations at Lane Funeral Home. She described the process of performing a cremation. When asked what she would do to ensure that she got as much of the cremains out of the retort as possible, Ms. Palmer explained: "You would - - the bottom of the retort had a very smooth, like a concrete finish almost, like a slick concrete, and you brushed it until you could - - pretty much it was smooth again."

Ms. Palmer explained that a metal medallion was put into the retort away from the fire to keep track of who was being cremated. Ms. Palmer explained that the number stayed with the body throughout the process to allow for identification. It was the funeral home policy to do this. Ms. Palmer performed more than ten but less then thirty cremations herself.

Ms. Palmer never visited Tri-State. When the Funeral Home would release a body to Marsh, they would give Marsh the paperwork and tell him when they needed the cremains back. Ms. Palmer stated that Marsh "was always very prompt and had it back the next morning or whatever time we specified." When asked if Deceased's cremains were returned to the Funeral Home, Ms. Palmer stated: "It's my understanding he was.… Well, his body has not been found, so I believe that the cremains that were brought back to us are his cremains."

Dr. Akers testified at trial. He and his wife had three children including Deceased. Dr. Akers received a medical degree but chose to work as a chiropractor in Bradley County beginning in 1976. In 1995, Dr. Akers was involved in a serious automobile accident and, as a result, lost 75 or 80% of the use of his left hand and could no longer practice as a chiropractor.

Dr. Akers described Deceased stating:

My son was the gentlest, kindest human being of his generation that I knew. Not once in high school did I have to go get my son out of trouble. Not once that I know of him being in a fight. He was soft spoken, very much like his mother. You will probably find out if she takes the stand. He was soft spoken, very patient; he was a good man; he was a great son, a great boy, and he grew into a good man. We had a good relationship.

Dr. Akers testified he was "appalled" when his son told him that he wished to be cremated when he died. Dr. Akers stated: "It was not the way my family has done things. I had nothing against it certainly. I honor anyone's last wishes, but it was not our way. It was not our way to be cremated. And my son had a specific desire to be cremated." Dr. Akers further stated: "We agreed to his wishes for the cremation, but we also wanted a service. So we decided to go with a memorial service, embalming him for a memorial service prior to cremation." Dr. Akers testified that he expected to receive his son's unadulterated cremains "except for minute parts."

Dr. Akers described how his son fell ill suddenly and died approximately three weeks later after Dr. and Mrs. Akers made the difficult decision to take Deceased off life support. Deceased was 34 years old when he died. At that time, Deceased was divorced but making plans to be remarried, and had a twelve year old daughter. Dr. and Mrs. Akers chose the Funeral Home in Cleveland, Tennessee for Deceased's service. Dr. Akers testified that when he and his wife signed the forms, the name for the crematorium was left blank. He stated they never would have authorized the cremation there if they had been advised about the conditions at Tri-State.

Dr. Akers testified that Deceased was wearing a kilt and other Scottish regalia for the memorial service. The kilt and regalia were returned to the Akers and Deceased was wearing a shirt and underwear when he went to the crematorium. When asked if Deceased was wearing blue jeans, Dr. Akers stated: "No. My son was a big man, and blue jeans, he wasn't comfortable in blue jeans." Deceased never had any heart problems or surgeries other than a hernia repair when he was a young child.

After Dr. Akers turned the Cremains over the to GBI and returned home:

It was a little strange. My wife didn't understand what was going on. We're simple people, and we didn't understand what was going on, and we didn't understand why, all of a sudden - - you know, we didn't understand why our son died at age 33 - - 34. And now we didn't understand why all this was

-15-

happening. Quite frankly, we seemed to lack the ability to communicate at that time. I felt as if I was at fault for some reason. I can't tell you why, but I felt like I was at fault for all of this, and I don't know, I felt that my wife would have to blame me. But she didn't - - she wasn't very communicative with me. She didn't really want to talk. The relationship was strained from that moment.

Dr. Akers testified: "I still want my son's body back. That's the ultimate. I want my son's body back." Dr. Akers stated that he is resigned to the fact that he will never get Deceased's body back. When asked if it would give him any comfort to know that Deceased's body had been cremated, Dr. Akers stated:

Goodness, no. My goodness, no. To place my son's body into that - - if, in deed [sic], he had been placed in that, that retort, that crematory, placing him amongst the filth, it's unspeakable that anyone would run an operation with a retort so filthy. The witnesses have testified that there was a layer of lamina, I think is what Dr. Berryman described. Lamina, layers of human remains built up, and to think that my first born, my son was placed in there, or could have possibly been placed in there, no, gave me absolutely no comfort whatsoever.

Dr. Akers stated: "The man who is in charge, the man who can answer the question [about whether the cremains are those of Deceased], refuses to. I don't know how comforting that can be."

When asked if he felt a responsibility to the person whose cremains are in the box, Dr. Akers stated:

Do I have a responsibility to this individual or individuals? Yes. Yes, because when this is over with, there's a good possibility they'll be returned to me. These are unknown to me. I can tell you, I could never treat them, inter them or treat them as if they were my son. I could never do that in light of the evidence that's been presented here. The crematory, their operations, their lack of records, the - - I'm sorry, unholy way in which human beings were treated. No, it - - I feel a responsibility to see that this individual gets an honorable disposition. I can never treat these as my son.

When asked what emotional impact the situation has had on him, Dr. Akers stated:

-16-

I guess the word that comes to mind for someone who has lived his life trying to be proactive in my life, to be responsible for the things I do, confusion would be a good word. I - - confusion and anguish, anxiety. You know, I couldn't get it off my mind. I couldn't sleep, and I had nightmares.

Dr. Akers described his recurring nightmares which included one in which he was walking through a field of dead bodies looking for his son and feeling frustrated and another in which his wife is asking him where their son is and he cannot answer. Dr. Akers also has cried, which he stated is not like him. Dr. Akers testified that he still has nightmares and still cries. Dr. Akers also described how the situation has made him very angry with no resolution. Dr. Akers stated that he was "outraged" when he saw Marsh's deposition and Marsh's refusal to answer the questions. Dr. Akers stated that the memory of seeing Marsh's deposition will stay with him, and further stated: "Seeing his face on that screen is a memory that will live with me forever. I didn't live my life like that, not taking responsibility for your own actions."

Dr. Akers also testified about the impact the situation has had on his marriage stating:

It had a nearly fatal - - by that, I mean terminal effect on my marriage. I didn't have anything to say to my wife. I couldn't answer her as to where our son's body was. We didn't know where to start talking. We've been married 44 years as of this past March, but up until then, it was 30-something years, and we had always - - our marriage had always been based on communications, and between mid - - early 2002 until late 2004, neither one of us wanted it this way. We stayed together, we lived together, but we did not communicate. It was as if there was a wall between us of questions that we couldn't answer. I didn't know whether she held me responsible for the things that had happened. I certainly didn't hold her responsible, yet I was remiss in that I didn't pursue further to get her feelings, and she didn't pursue further to get my feelings. We drifted apart for a better part of two years, and the marriage came that close (indicating) to failing.

Dr. Akers admitted that he had an extra-marital affair during that time beginning around April or May of 2002 and lasting for approximately two years. Dr. Akers stated:

And this individual [whom I was working with on a video production] became close to me and, unfortunately, because of the situation at home and the lack of communications, things happened in that relationship that I am so, so sad

about, that shouldn't have happened. A relationship developed that shouldn't have developed. It was just like watching someone else.

Dr. Akers confessed the affair to his wife, and she has forgiven him.

Dr. Akers testified that he has suffered from depression. He admitted that he had some depression ever since he lost his ability to practice as a chiropractor, and he experienced depression upon the death of his son. Dr. Akers testified, however, that the depression associated with the situation surrounding Tri-State was different. Dr. Akers stated:

> Totally different. Totally different. It was more of a personal nature. Yes, I was depressed to a certain extent over losing my profession. As I indicated earlier, that was my identity, that's what I do, I'm a chiropractor. I even went to medical school to get a degree, came back, I was still drawn to chiropractic. That's how I identified myself, how I identify myself to this day. And that was taken from me by a traffic accident. And yes, there was some depression associated with going from a 12-hour-a-day professional who really felt that I was doing good in the community, to somebody who couldn't.… [But the Tri-State situation was] [s]omething I couldn't do anything about. An open sore, so to speak. Nothing seemed to help. Nothing seemed to help the fact that I did not believe this was my son. My wife did not believe this was my son.

Dr. Akers saw a psychiatrist, Dr. Robert Tucker Spalding, for his depression. Portions of the videotaped deposition of Dr. Spalding were played at trial. Dr. Akers began seeing Dr. Spalding in October of 2004, and had last seen him only a month prior to trial. Dr. Spalding had prescribed antidepressants to Dr. Akers in addition to the talk therapy they were doing.

When asked about how much the mystery and confusion centered around the attempts to locate Deceased's body may have contributed to Dr. Akers's depression, Dr. Spalding testified:

> I think I used an analogy that you put so much weight on - - one of these balance scales and it tips, and you can't tell exactly what was the thing that tipped it. He was very depressed about his son's death, and then the frustration of locating the body, being given - - told a body was his son's, which was not, added to the frustration, in terms of teasing out what percentage, there's no way that I could do that outside of saying it was another factor, another weight

on the scale that tipped him toward depression.

When asked, Dr. Akers testified that he could not put a value on his son's body, but it is priceless to him.  Dr. Akers described how he likes to visit the graves of other relatives and finds that comforting.  Dr. Akers further stated:

I like to go through life thinking that the world is good and there is bad in the world - - bad in the whole world.  My belief has been altered significantly now to know that there are people who expect me - - who expect me, in this world, to believe that these are my son's cremains, and yet they won't stand up and tell me they are.  The very person who can tell me won't tell me.  That's - - it has shaded my opinion of the world, and it's opened a dark place inside of me that I don't know if it will heal.

Mrs. Akers testified at trial.  She was 64 years old at the time of trial.  When asked if Deceased was wearing blue jeans when he was sent to Tri-State, Mrs. Akers stated: "No.  He hardly ever wore blue jeans because he was big.  I think he had one pair he had a few years before he died that he got at the Big & Tall Men's Shop.  That's about the only place he could find pants that would fit him."

Mrs. Akers explained that she picked up the Cremains from the Wildwood branch of the Funeral Home.  She did not know why the Cremains were at the Wildwood branch when she and her husband had been dealing with the Ocoee branch of the Funeral Home, and when she asked, the Funeral Home had no explanation.

Mrs. Akers testified about her emotional condition when she first learned about Tri-State stating:

It was all hard to deal with.  Not only having him cremated, it was hard to do that, and then dealing with this hearing stories about all the bodies they found just thrown like garbage, my son being treated like a bag of garbage.  I couldn't deal with it.…  It affected everything.  I shut down.  I admit I couldn't talk to [my husband] about it.  I withdrew.  I didn't talk to family.  The only thing I could do to get away from it was at work.  I could go to work, I could stay busy, that was my therapy.

When asked if she cried, Mrs. Akers stated:

All the time.  I'm not a crying person.  My parents taught me to deal with your problems, don't cry in public.  They were very proud people.  If you had to

-19-

mourn, mourn in private, and this has made me cry in front of people.… That hurts, too, because I can't deal with it, and I've always been able to handle things.

Mrs. Akers testified that she has had: "A lot of nightmares. I can't sleep anymore. I still wake up early and I've just seen horrible things. I'm trying to find my son. I don't know where he is." Mrs. Akers was asked about her feelings when she saw the videotape of Marsh's deposition when he invoked his Fifth Amendment privilege, and she stated: "If he had of been really sorry he would have told us what he did with him, wherever he threw his body, whatever horrible thing he did to him, he would have told us, and he didn't, he took the Fifth."

Mrs. Akers was asked about the problems that developed between her and her husband and she stated:

Looking back I don't know if I could have handled it any different. I stopped talking to him. I didn't want to be in the house. I worked all the time. I would get to bed and I would wake up in [sic] 3:00 in the morning and I would go to work. I just wanted to be by myself and just work as hard as I could to keep my mind off of it. I would stay late. I worked through lunch. I didn't want to go out with the girls anymore. I didn't want them talking to me. I didn't want to answer questions. I quit talking to them. I just quit talking to him. He even asked me why don't I talk about it and I said no.

When asked if having the Cremains comforts her, Mrs. Akers stated: "No. I don't know who those people are. I looked at it through this trial while it was sitting up here and I feel so bad for all the other families that this may be theirs, this may be husbands and wives, who knows." Mrs. Akers feels a responsibility to the Cremains "because those mixtures or whatever belong to somebody," and they deserve respect. When asked if she had suffered serious emotional injuries, Mrs. Akers stated: "I don't think I'll ever get over this."

Howard Martin Stinnett a close friend of the Akers for many years testified. Mr. Stinnett was asked about what he has observed in terms of the impact that the situation has had on the Akers and he stated:

It's really been devastating to them. They have two other children that are still alive. They seem to be doing well. But Ron has never been the same man that he was prior to this. He is a good man, but he and Lucinda neither one have ever softened their pain. It's still there just like it just happened.

-20-

After the trial and their deliberations, the jury completed its verdict form finding that Marsh intentionally inflicted emotional distress upon the Akers, that Marsh violated the Tennessee Consumer Protection Act, and that Marsh violated a bailment responsibility he had to the Akers. The jury found that Dr. Akers had damages in the amount of $275,000, and that Mrs. Akers had damages in the amount of $475,000. The Trial Court entered a Final Judgment upon the jury verdict on May 5, 2009.

Marsh filed a motion for new trial or for judgment notwithstanding the verdict. The Akers filed a motion seeking treble damages and attorney's fees under the Tennessee Consumer Protection Act. After a hearing, the Trial Court granted Marsh a partial judgment notwithstanding the verdict dismissing the claims under the Tennessee Consumer Protection Act and bailment, denied the Akers' motion seeking treble damages and attorney's fees, affirmed the judgment as to intentional infliction of emotional distress, and denied Marsh's motion for a new trial. Marsh appeals to this Court.

## **Discussion**

Marsh raises numerous issues on appeal which we consolidate and restate as follows: 1) whether the Trial Court erred in charging the jury that they may take a negative inference from Marsh's invocation of his Fifth Amendment privilege; 2) whether the Trial Court erred in admitting photographic and video evidence of the mishandling of bodies other than that of Deceased; 3) whether the Akers proved intentional infliction of emotional distress; 4) whether the outrageous conduct jury instruction utilized by the Trial Court and the jury verdict form were invalid or improper; and, 5) whether the Trial Court erred in allowing comments about Marsh's unlimited resources to be made during closing argument. The Akers raise an issue regarding whether the Trial Court erred in granting Marsh's motion for judgment notwithstanding the verdict with regard to the Tennessee Consumer Protection Act claim and the breach of bailment claim.

We first consider whether the Trial Court erred in charging the jury that they may take a negative inference from Marsh's invocation of his Fifth Amendment privilege. In his brief on appeal, Marsh makes two arguments with regard to his invocation of the Fifth Amendment privilege. First, Marsh argues that a negative inference may not be used to prove a case without corroborating evidence. Second, Marsh argues that the Trial Court erred in permitting the Akers to read questions and answers from Marsh's deposition to the jury wherein Marsh asserted his Fifth Amendment privilege, but the Trial Court did not instruct the jury that they may take a negative inference.

With regard to the first of his arguments, Marsh asserts that it was improper to allow the use of a negative inference from Marsh's invocation of his Fifth Amendment

privilege without producing any corroborating evidence of their claims that the body of Deceased was mishandled. As this Court has stated:

> The United States Supreme Court has determined that there is no constitutional impediment to drawing an inference against a party invoking his or her Fifth Amendment privilege in a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558, 47 L. Ed. 2d 810 (1976); Robert Heidt, *The Conjurer's Circle - The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1110-12 (1982). Accordingly, the majority of jurisdictions, including Tennessee, permit fact-finders to draw adverse inferences against parties who invoke their Fifth Amendment rights in [a] civil case. *See Rachels v. Steele*, 633 S.W.2d 473, 476 (Tenn. Ct. App. 1981); VIII John H. Wigmore, *Evidence* § 2272, at 439 (McNaughton rev. 1961).

*Levine v. March*, 266 S.W.3d 426, 442 (Tenn. Ct. App. 2007). More recently, this Court stated:

> In interpreting [*Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)], lower courts have uniformly held that the gravamen of the *Baxter* case is that such adverse inference can only be drawn when independent evidence exists concerning the fact that the party refuses to answer. *See, e.g., LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995); *Peiffer v. Lebanon Sch. Dist.*, 848 F.2d 44, 46 (3d. Cir. 1988). An adverse inference may be drawn when silence is countered by independent evidence of the fact being; however, that inference cannot be drawn when, for example, silence is the only answer to the allegation contained in the complaint. *See Nat'l Acceptance Co. v. Bathalter*, 705 F.2d 924, 930 (7th Cir. 1983). In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation; otherwise, no negative inference will be permitted. *LaSalle Bank*, 54 F.3d at 391.

*Steppach v. Thomas*, No. W2010-00606-COA-R3-CV, 2011 Tenn. App. LEXIS 91, at **88-89 (Tenn. Ct. App. Feb. 28, 2011), *Rule 11 appl. perm. appeal denied July 15, 2011*.

The Akers did present other corroborating evidence that would tend to show that the body of Deceased was mishandled and not properly cremated. For instance, the Akers presented evidence of the manner in which Marsh was treating other bodies during the same time period in which Deceased's body was transported to Tri-State. This evidence was both in the form of testimony given by Agent Ramey and Dr. Berryman, and in the form of

photographs and video showing the Tri-State property and the mishandled bodies.

The Akers also presented evidence of the fact that Marsh pled guilty to the felony of criminal simulation with regard to Deceased's body. Marsh argues in his brief on appeal that "[a]lthough a guilty plea can be used as evidence in a civil trial on liability, it is not conclusive evidence." Marsh relies upon *Grange Mut. Cas. Co. v. Walker*, 652 S.W.2d 908 (Tenn. Ct. App. 1983) for this proposition. In *Grange Mut. Cas. Co.*, this Court actually stated:

> A plea of guilty, however, is generally not conclusive on the issues in a subsequent civil action, *Patrons-Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888 (Me.1981); *Kickasola v. Jim Wallace Oil Co.*, 144 Ga.App. 758, 242 S.E.2d 483 (1978), but is competent evidence as an admission against interest. *State Farm Mutual Auto. Ins. Co. v. Worthington*, 405 F.2d 683 (8th Cir.1968); *Boshnack v. World Wide Rent-a-Car, Inc.*, 195 So.2d 216 (Fla.1967); *Tietelbaum Furs, Inc., supra; McDaniel v. Textile Workers Union of America*, 36 Tenn.App. 236, 254 S.W.2d 1 (1952); Paine, *Tennessee Law of Evidence*, §§ 13 and 55 (1974); and cases cited in 18 A.L.R. 1287, at 1311 and supplements.

*Grange Mut. Cas. Co. v. Walker*, 652 S.W.2d 908, 910 (Tenn. Ct. App. 1983). Marsh's guilty plea constitutes competent evidence as an admission against interest, and makes it more likely than not that Marsh mishandled Deceased's body.

Marsh argues in his brief on appeal that evidence of a guilty plea is not conclusive evidence in a civil trial and that a defendant may present an explanation as to why he entered into the guilty plea. Marsh further argues that his guilty plea should not be considered because at the time that he entered into the plea, the Akers thought that they had been given potting soil and not human cremains. Marsh argues that "[t]he guilty plea was also inappropriate as evidence of liability because it was based on information later proved to be false." We note, however, that Marsh is the only person who knows what happened to Deceased's body, that Marsh possessed this information before entering into the guilty plea, and that Marsh freely pled guilty to the felony of criminal simulation with regard to Deceased's body. As Marsh himself, however, provided no explanation whatsoever as to why he entered into the guilty plea, and instead has chosen to consistently invoke his Fifth Amendment privilege, this argument is immaterial. We find this argument to be without merit.

Given all of the above, we find, contrary to Marsh's assertion, that the Akers did provide corroborating evidence that makes it more likely than not that Marsh mishandled

Deceased's body and failed to properly cremate it. As such, we find no error in the Trial Court's charge to the jury that it may give a negative inference to Marsh's invocation of his Fifth Amendment privilege.

Marsh's second argument concerns questions and answers from Marsh's deposition to which "no negative inference applied" and which were read to the jury without the Trial Court instructing the jury that they may take a negative inference. Pursuant to Tenn. R. Civ. P. 32.01 (2): "The deposition of a party … may be used by an adverse party for any purpose." Tenn. R. Civ. P. 32.01 (2). This rule could not be any clearer. The Akers were free to use Marsh's deposition "for any purpose" not prohibited by case law or the Rules of Evidence. From our independent review of these questions and answers, we find absolutely nothing in the record to support Marsh's argument that the reading of these questions and answers in any way mislead the jury. We believe the Trial Court's instructions were adequate, and we find no error by the Trial Court relative to this issue. Further, even if it was error, it was harmless error as our considering the record as a whole shows that it did not "more probably than not [affect] the judgment or ... result in prejudice to the judicial process." Tenn. R. App. P. 36 (b).

We next consider whether the Trial Court erred in admitting photographic and video evidence of the mishandling of bodies other than that of Deceased. "The appellate court affords the trial court wide discretion regarding the admissibility of evidence and will not overturn the trial court's determination absent an abuse of that discretion." *Goodale v. Langenberg*, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007).

As pertinent to this issue, Tenn. R. Evid. 401 provides:

> **Rule 401. Definition of "relevant evidence."** – "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides:

> **Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** – Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403.  As this Court noted in *Goodale*:

> Additionally, we have observed that the plain language of the rules "strongly suggests" that when the balance between the evidence's probative value and any prejudicial effect is close, the evidence should be admitted.  *Id.* at 21 (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 403.3, at 152 (3d ed. 1995)).  Therefore, excluding relevant evidence under rule 403 "is an extraordinary step that should be used sparingly." *Id.*

*Goodale*, 243 S.W.3d at 587.

In his brief on appeal, Marsh states that the: "Evidence necessary to the determination of the issues in this case is (1) evidence that indicates it is more or less likely that the Akers' son was cremated and (2) evidence that indicates it is more or less probable that Plaintiffs were returned the cremated remains of their son."  Marsh argues that photographs and the videotape that show other bodies do not show that it was more or less likely that Deceased was cremated or that his body was mishandled, and, therefore, those images were irrelevant.  We disagree.

First, Marsh has mis-characterized the evidence necessary to the determination of the issues in the case.  The relevant evidence is evidence that shows that it is more or less likely that Deceased's body was mishandled and not properly cremated.  As Marsh invoked his Fifth Amendment privilege with regard to questions about Deceased's body, and there is no direct evidence as to what happened to Deceased's body, the photographs that show how Marsh was treating bodies at Tri-State are relevant and tend to show that it is more likely that Deceased's body was mishandled.

Furthermore, even if Deceased's body were cremated at Tri-State, the evidence shows, as discussed more fully below, that the cremation was not done properly in accordance with industry standards and the authorization given by the Akers.  The photographs and video of other bodies found at Tri-State show that it was more likely that Deceased's body was mishandled and, even if it were cremated, was not properly cremated.

Marsh also argues that the evidence of other bodies should have been excluded because of the danger of unfair prejudice.  Marsh argues in his brief on appeal that "the only purpose the photographs and video served was to inflame the jury and prejudice them against Marsh," and that "[t]he admission of images of dead bodies likely disturbed the jury and caused an emotional response which was not the proper basis for determining the material issues of fact."  While we agree that the photographs and videotape are disturbing, we do not agree that the only purpose for their admission was to inflame the jury and prejudice them

against Marsh. As we discussed above, these images are relevant to the issues that were before the jury and, since Marsh invoked his Fifth Amendment privilege, were relevant to show that it was more likely than not that Deceased's body was mishandled and not properly cremated. Furthermore, the photographs and videotape were relevant to show the outrageous nature of Marsh's actions as to Deceased's body, which the Akers had to prove in order to recover for intentional infliction of emotional distress.

Marsh also argues that admission of the photographs was inappropriate because they "were used to suggest harm was done to the bodies." Marsh argues: "Decay is a natural process, but the numerous photographs of decaying bodies combined with the Akers' attorney's argument that the body of the Akers' son could have been mutilated, confuse the natural process with an injury done to the bodies." What Marsh has failed to acknowledge in this argument is that the photographs show that these bodies were handled inappropriately and left to decay in inappropriate places. The photographs do not simply depict the natural process of decay, they depict the manner in which the bodies were mishandled, and the fact that these bodies were allowed to decay in wholly inappropriate places and ways. We find no abuse of discretion in the Trial Court's admission of the photographs and the videotape.

We next consider whether the Akers proved intentional infliction of emotional distress. As our Supreme Court has instructed:

An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

With regard to intentional infliction of emotional distress, or outrageous

conduct[3], there are three essential elements to this cause of action: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). As discussed by the *Bain* Court, this is not an easy burden to meet. *Id.* According to *Bain*:

> [T]his Court has adopted and applied the high threshold standard described in the Restatement (Second) of Torts as follows:
>
>> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Bain*, 936 S.W.2d at 622-23.

> With regard to the third necessary element of intentional infliction of emotional distress, this Court has noted that:

> [S]erious mental injury is that in which "'the distress is so severe that no reasonable [person] could be expected to endure it.'" [*Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999)] (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). In *Miller v. Willbanks*, the Tennessee Supreme Court recognized that a plaintiff may establish such emotional harm by several means, such as through the plaintiff's own testimony, lay witness testimony of the plaintiff's acquaintances, physical manifestations of emotional distress,

---

[3]"Intentional infliction of emotional distress and outrageous conduct are not two separate torts, but are simply different names for the same cause of action." *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997).

evidence of nightmares, insomnia and depression, proof of psychiatric treatment, or evidence of the mental distress' intensity and duration. *Id*. at 615.

*Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004). In *Miller v. Willbanks*, our Supreme Court emphasized:

Although the plaintiff is generally not required to present expert testimony to validate the existence or severity of a mental injury, we emphasize that the evidence must establish that the plaintiff's mental injury is serious or severe.

It is only where [the mental injury] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress is so severe that no reasonable [person] could be expected to endure it.

*Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). Our Supreme Court also has instructed: "A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).

Marsh argues that the Akers failed to prove that the conduct complained of was intentional. We disagree. The proof in the record on appeal shows that Marsh pled guilty to the felony of criminal simulation with regard to Deceased's body. The proof also shows the horrible manner in which Marsh treated the bodies entrusted to Tri-State for cremation. The proof shows that Marsh was routinely not cremating bodies, but was instead improperly burying or dumping them. The proof also clearly shows that even when Marsh did cremate a body the cremation was not done in accordance with industry standards and the authorization given by Dr. and Mrs. Akers. Even if Deceased were cremated, the proof shows that the cremation was done in a wholly inappropriate manner, using a disgustingly filthy retort and improper tools, which could only result in substantial commingling with the cremains of other previously cremated bodies. This fact was clearly shown by the testimony of Dr. Berryman when he described how a cremation is performed at a quality crematorium, and the condition of the Tri-State retort, and by the testimony of Ms. Palmer who also described how a proper cremation is performed. In addition, the answers to the survey of several other funeral homes done by Dr. Berryman and his colleague show that anything other than minimal commingling of cremains is most probably the result of improper procedures, sloppy work, or deliberate malfeasance. The proof in the record shows that

material evidence was produced that Marsh acted with the intent to engage in the conduct of mishandling Deceased's body and failing to properly cremate Deceased's body.

As for the second element of intentional infliction of emotional distress, i.e., the conduct must be so outrageous that it is not tolerated by civilized society, the record is replete with evidence that Marsh's conduct was so outrageous as to not be tolerated by society. Agent Ramey and Dr. Berryman both testified extensively about the horrendous conditions at Tri-State, and numerous photographs and a videotape were introduced at trial clearly depicting these conditions. In addition, Dr. Berryman and Ms. Palmer both testified as to how a cremation is conducted at a facility where bodies are being cremated properly, or what Dr. Berryman described as a "quality crematorium." Thus, ample evidence was produced to the jury showing that Marsh's conduct was a far cry from what is normal in the operation of a crematorium. We do not think that any reasonable juror presented with the evidence in the record now before us would fail to find that Marsh's conduct was extremely outrageous.

Marsh also argues that the Akers did not prove that his conduct resulted in serious mental injury. We disagree. Both Dr. and Mrs. Akers testified in detail how the situation at Tri-State involving Deceased has had a serious effect upon them mentally and emotionally. Mr. Stinnett, a close friend of the Akers, testified that the Tri-State situation involving Deceased has had a "devastating" effect upon the Akers. In addition, Dr. Spalding, who treated Dr. Akers, testified how the situation surrounding Tri-State involving Deceased added another stressor that tipped the scales toward depression.

Marsh argues that Dr. Akers's depression was a pre-existing condition not caused by Marsh's conduct and the Tri-State situation, and therefore, the Akers did not prove damages. We disagree.

As this Court stated in *Emert v. City of Knoxville*:

A tortfeasor is liable for all injuries proximately caused to a plaintiff. When the plaintiff has a pre-existing medical condition, "the defendant is responsible for all ill effects which naturally and necessarily follow the injury in the condition of health in which the plaintiff was at the time of the [injury]." *Elrod v. Town of Franklin*, 140 Tenn. 228, 240, 204 S.W. 298, 301 (1917). Thus, it has long been the law that a tortfeasor "must accept the injured person as he finds him," in that the tortfeasor is liable for the injury or harm actually caused by or which is the natural consequence of the tortfeasor's negligence whether the plaintiff was "weak or strong, healthy or sick" before the accident. *Id.*

*Emert v. City of Knoxville*, No. E2003-01081- COA-R3-CV, 2003 Tenn. App. LEXIS 813, at **9-10 (Tenn. Ct. App. Nov. 20, 2003), *no appl. perm. appeal filed*.

The record contains material evidence upon which the jury based its decision that the Akers proved severe emotional damages.

Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all evidence that supports it, allowing all reasonable inferences to sustain the verdict, and discarding all countervailing evidence, as we must, we find that there is material evidence in the record sufficient to support the jury's verdict that Marsh intentionally inflicted emotional distress upon the Akers.

Next, we consider whether the outrageous conduct jury instruction utilized by the Trial Court and the jury verdict form were invalid or improper. As this Court explained in *Goodale v. Langenberg*:

> The trial court's instructions guide the jury in its deliberations. The instructions must be plain and understandable, and must inform the jury of each applicable legal principle. *Wielgus v. Dover Indus.*, 39 S.W.3d 124, 131 (Tenn. Ct. App. 2001). They must also reflect the theories that are supported by the parties' pleadings and proof, as well as the parties' claims and defenses. *Cole v. Woods*, 548 S.W.2d 640, 642 (Tenn. 1977). Jury instructions must be correct and fair as a whole, although they do not have to be perfect in every detail. *Wielgus*, 39 S.W.3d at 131. Upon review, we read a trial court's instructions to the jury in their entirety and in context of the entire charge. *See id*. Additionally, where the trial court's instructions clearly and definitely set forth the elements upon which liability must be based, the failure to recite each element in the verdict form will not render the verdict invalid. *State v. Faulkner*, 154 S.W.3d 48, 62 (Tenn. 2005).

*Goodale v. Langenberg*, 243 S.W.3d 575, 584 (Tenn. Ct. App. 2007).

Marsh argues that the Trial Court erred in charging the jury using the pattern jury instruction for intentional infliction of emotional distress because Marsh asserts that the law has changed in this area as a result of our Supreme Court's Opinion in *Doe v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22 (Tenn. 2005). We disagree with Marsh's assertion that the law has changed with regard to intentional infliction of emotional distress. *Doe v. Roman Catholic Diocese of Nashville* dealt with the elements of reckless infliction of emotional distress and specifically stated that the *Doe* Court was expressing no opinion concerning the elements of claims of intentional infliction of emotional distress. *Doe v.*

*Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 39 n.29 (Tenn. 2005).

Marsh urges this Court to express a change in the law with regard to the elements of intentional infliction of emotional distress commensurate with the Supreme Court's pronouncement in *Doe v. Roman Catholic Diocese of Nashville*. Unfortunately for Marsh, it is not the role of this Court to change the law. Rather it is the role of this Court to interpret and apply the law as it exists. The law as it exists with regard to intentional infliction of emotional distress is fully discussed and applied above. Marsh's argument is better addressed to our Supreme Court or our General Assembly.

Furthermore, Marsh admits in his brief on appeal that the instruction given to the jury concerning recklessness was "unnecessary," and that "[t]he facts presented during the trial pointed to a theory of intentional infliction of emotional distress." We agree. The word "reckless" in the instructions was mere surplusage, which caused no harm. The instructions as a whole were plain and understandable and informed the jury of each applicable legal principle.

Marsh also argues on appeal that the jury verdict form was improper because it did not provide separate spaces for damages for the different claims, but rather just provided one space for all damages. Marsh did not raise this issue below. The law in Tennessee is well settled that issues not raised in the trial court may not be raised on appeal. *E.g., In re: The Guardianship of R.D.M.*, 306 S.W.3d 731, 736 (Tenn. Ct. App. 2009). This issue is without merit.

Marsh also argues that the jury verdict form was confusing for the jury as it contained the phrase "outrageous conduct" in addition to the phrase "intentional infliction of emotional distress." As we mentioned above, outrageous conduct is simply another name for the tort of intentional infliction of emotional distress. As such, we fail to see how utilizing both phrases could have confused anyone. We find no error in the Trial Court's use of the pattern jury instruction for intentional infliction of emotional distress, or in the use of the jury verdict form.

Next, we consider whether the Trial Court erred in allowing comments about Marsh's unlimited resources to be made during closing argument   As this Court stated in *McCall v. Bennett*:

> [A]n issue regarding the propriety of statements made by opposing counsel during closing argument is waived if raised for the first time in a motion for new trial. "The law is well-settled in this state that '[a]n objection to the remarks or conduct of counsel must be made at the trial and a ruling had

thereon, or they will not be considered on appeal.'" *Id.* (quoting *Lee v. Lee*, 719 S.W.2d 295, 299 (Tenn. Ct. App. 1986)). *See also Marress v. Carolina Direct Furniture*, 785 S.W.2d 121, 126 (Tenn. Ct. App. 1989).

*McCall v. Bennett*, 243 S.W.3d 570, 573 (Tenn. Ct. App. 2007).

While Marsh did not wait until filing his motion for new trial to raise an objection to the comments made during opposing counsel's argument, he did wait until after the jury had retired to deliberate before making the objection. We do not find this to be a "contemporaneous objection" to counsel's statements. *See State v. Armstrong*, 256 S.W.3d 243, 249 (Tenn. Crim. App. 2008) (stating "typically when a prosecutor's statement was not the subject of a contemporaneous objection, the issue is waived."). At the time that Marsh raised his objection, it was too late for the Trial Court to have taken any effective action to cure any error, assuming for purposes of argument that an error had occurred. We, therefore, find that the objection was not made "at the trial and a ruling had thereon …," and was waived. *McCall*, 243 S.W.3d at 573. We also note that even if it were error, it was harmless error as our consideration of the whole record shows that it did not "more probably than not [affect] the judgment or … result in prejudice to the judicial process." Tenn. R. App. P. 36 (b).

We now turn to the issue raised by the Akers regarding whether the Trial Court erred in granting Marsh's motion for judgment notwithstanding the verdict with regard to their Tennessee Consumer Protection Act claim and the breach of bailment claim. As this Court has explained:

> A bailment is a delivery of personalty for a particular purpose or on mere deposit, on a contract expressed or implied, that after the purpose has been fulfilled, it shall be re-delivered to the person who delivered it or otherwise dealt with according to his direction or kept until he reclaims it.

*Merritt v. Nationwide Warehouse Co., Ltd.*, 605 S.W.2d 250, 252 (Tenn. Ct. App. 1980).

There are two problems with the Akers' theory of bailment. First, a dead body does not fit within the definition of personalty. Second, the agreement that the Akers had was with the Funeral Home, not with Marsh or Tri-State. In fact, the Akers testified that they had no idea that Deceased's body was going to be taken to Tri-State. The space in the Authorization for the name of the crematorium was blank when the Authorization was signed, and when the Akers inquired about where the body would be taken the Funeral Home told them that it would most probably be a crematorium in Chattanooga. In addition, Dr. Akers testified that had he known about Tri-State, he never would have consented to allow

-32-

the release of Deceased's body to Tri-State. The evidence in the record simply does not support a claim for bailment. As such, we find no error in the Trial Court's grant of a judgment notwithstanding the verdict dismissing the claim of bailment.

With regard to the claim under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-109 provides, in pertinent part:

**47-18-109. Private right of action – Damages – Notice to division. –**
(a)(1) Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.
(2) The action may be brought in a court of competent jurisdiction in the county where the alleged unfair or deceptive act or practice took place, is taking place, or is about to take place, or in the county in which such person resides, has such person's principal place of business, conducts, transacts, or has transacted business, or, if the person cannot be found in any of the foregoing locations, in the county in which such person can be found.
(3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper....

Tenn. Code Ann. § 47-18-109 (a) (2001). In pertinent part, Tenn. Code Ann. § 47-18-104 provides that unfair or deceptive acts include: "Engaging in any other act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104 (b)(27) (2001).

In *Searle v. Harrah's Entm't, Inc.*, this Court stated: "Only actual damages may be trebled under the TCPA, Tenn. Code Ann. § 47-18-109 (a)(2)-(3), and damages awarded for emotional distress do not constitute actual damages." *Searle v. Harrah's Entm't, Inc.*, No. M2009-02045-COA-R3-CV, 2010 Tenn. App. LEXIS 627, at *36 (Tenn. Ct. App. Oct. 6, 2010), *no appl. perm. appeal filed*. As the Akers were awarded damages for emotional distress, and emotional distress damages do not constitute actual damages under Tenn. Code Ann. § 47-18-109, we find no error in the Trial Court's grant of a judgment notwithstanding the verdict with regard to the claim under the Tennessee Consumer Protection Act.

## **Conclusion**

The judgment of the Trial Court is affirmed. This cause is remanded to the Trial Court and costs shall be collected in compliance with our Order of February 16, 2011 wherein we stated:

> Because the trial court clerk has failed to complete and transmit the record for this appeal in the time and manner provided in the rules of appellate procedure, the trial court clerk shall forfeit to the appellant the clerk's entire fee set forth in Tenn. Code Ann. § 8-21-401(i)(11) for preparing and transmitting the record. *See* Tenn. R. App. P. 40(i). In addition, the court exercises its discretion, and taxes all costs at the appellate level associated with the efforts to ensure the filing of an accurate and complete record for this appeal, to the trial court clerk, said costs to be collected at the conclusion of this appeal.

Costs on appeal not otherwise provided for are assessed against the appellant, T. Ray Brent Marsh, and his surety.

_____
D. MICHAEL SWINEY, JUDGE